George RIOS, et al., Plaintiffs,

v.

ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL 638 OF U.A., et al., Defendants.

EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, Plaintiff,

v.

ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL 638 OF U.A., et al., Defendants.

Nos. 71 Civ. 847, 71 Civ. 2877.

United States District Court, S.D. New York.

Nov. 18, 1986.

Memorandum Granting Motion for Reconsideration Dec. 5, 1986.

**110**

Marshall E. Lippman, New York City, administrator-designee.

Robert L. Williams, Regional Atty., James L. Lee, Supervisory Trial Atty., Richard A. Meyerson, Senior Trial Atty., William Rodriguez, Trial Atty., E.E.O.C., Barbara A. Morris, National Employment Law Project, Inc., New York City, for plaintiffs.

Richard S. Brook, Garden City, for defendants Enterprise Ass'n Steamfitters Local 638 of U.A., et al.

## MEMORANDUM AND ORDER

BONSAL, District Judge.

These proceedings were instituted by the plaintiffs as a class action and by the Equal Employment Opportunity Commission ("EEOC") against Enterprise Association Steamfitters Local 638 of U.A., et al. (the "Union"). Following a trial, the Union was adjudged to have discriminated against black and Spanish-surnamed persons who had applied for membership in the Union's A Branch (*United States v. Local 638, etc.,* 360 F.Supp. 979 (1973)). Members of the A Branch who claimed they had suffered discrimination filed claims for back pay.

On June 21, 1973 this court appointed Vincent D. McDonnell, Esq. as Administrator with respect to the claims for back pay. In 1979, Mr. McDonnell was relieved of his duties at his request. Mr. McDonnell recommended to the EEOC, the National Employment Law Project, Inc. ("NELP"), and the Union that Marshall E. Lippman, Esq. should thereafter serve in his stead. By letter dated May 16, 1979 Mr. McDonnell informed the court that Mr. Lippman had been approved by all the parties to conduct the back pay proceeding. Since that time, Mr. Lippman has performed the Administrator's duties under the title of Administrator-Designee.

This court's Judgment of June 21, 1973 laid down the requirements that a claimant had to prove to establish his right to back pay, which Judgment was modified by the Court of Appeals. *Equal Employment Opportunity Commission v. Enterprise Association Steamfitters Local No. 638 of U.A.,* 542 F.2d 579 (2d Cir.1976). A claimant is required to prove that he had applied for, and was denied, admission to the A Branch after August 19, 1967; that at the time of his application he resided within the geographical jurisdiction of the Union (the five boroughs of New York City, and Nassau and Suffolk Counties); that he was subsequently admitted to the Union's A Branch; and that by reason of the discrimi-

nation he has sustained monetary damages in the form of lost back pay.

The Administrator-Designee conducted hearings to determine which claimants had established that the Union was liable to them for back pay, (Phase I). The Administrator-Designee filed his report with the court on July 10, 1984. His report showed that 68 persons filed back-pay claims and that, after hearings, he found that 31 claimants had established liability for back pay. He dismissed the remaining 37 claims. With respect to each of the claims the Administrator-Designee made findings of fact and conclusions of law. Of the 68 claims which he heard and adjudicated, five have not been appealed. The EEOC and the NELP have appealed 32 decisions where the Administrator-Designee dismissed the claims, while the Union has appealed 31 decisions in which the Administrator-Designee found liability established. On October 9, 1984 this court confirmed the report of the Administrator-Designee.

Thereafter, the Administrator-Designee conducted hearings to determine the amount of the loss of back pay, if any, suffered by the claimants whose claims had been allowed, (Phase II).

On May 8, 1986 the Administrator-Designee distributed a preliminary draft report, which was reviewed by the parties. At the court's direction, the Administrator-Designee held further conferences with the parties so that they had a further opportunity to review his calculations and supporting data. On July 22, 1986 the Administrator-Designee filed his Final Report for Phase II, listing the successful claimants and the amounts of back pay, if any, to which he found each was entitled.

Detailed objections to the Administrator-Designee's Final Report have been filed on behalf of the plaintiffs by the NELP and the EEOC, and on September 26, 1986 the Union filed a memorandum in opposition to plaintiffs' objections to the Final Report of the Administrator-Designee.

■ Plaintiffs contend that the Administrator-Designee used an arbitrary or unfair procedure in calculating starting dates for back-pay entitlement. The Back-Pay Order, dated October 9, 1975, provides:

> Discrimination ... for purpose of back pay will commence on the date on which the next applicant for membership in the A Branch who does not qualify as a member of the plaintiff class was admitted to the A Branch.

Plaintiffs state that in determining the "next applicant," the Administrator-Designee failed to include admissions into the A Branch of B Branch members and apprentices; transfers-in from other locals; paragraph 12's (non-minorities admitted to the A Branch pursuant to paragraph 12 of the Court's Order dated June 21, 1973); and reinitiations. These matters were considered by the Administrator-Designee in his decision of May 14, 1985. With respect to the admission of B Branch members, the Administrator-Designee stated:

> Moreover, the issue of admission to the "B–Branch" is, itself, integrally involved in the subsisting issues of the suit. I do not find the transfers from the "B Branch" to the "A Branch" were necessarily as "neutral" as "transfers-in" from other locals. However, in reviewing the admission of non-minorities for "triggering" back-pay, I have not found any instance where a determination of this issue affects the entitlement of any member of the claimant class and accordingly I find it unnecessary at this time to determine the issue.

As to apprentice members, they were not "new" A Branch members since they tracked into the A Branch after completing their training. With respect to transfers from other locals, the Administrator-Designee found that these were not admissions over which the Union exercised any discretion, citing Section 231.(a) of the Constitution and By-Laws of the United Association.

With respect to admissions pursuant to paragraph 12 of the Back-Pay Order of this court, the Administrator-Designee stated:

> ... my review of the documentation failed to disclose an instance where a

non-minority admission pursuant to paragraph 12 affected back pay liability. Accordingly, I have found it unnecessary at this time to decide the issue of paragraph 12 Non-Minorities and any impact they may have on "triggering" back pay liability for the claimant class.

Reinitiations apparently refers to members of the A Branch who had been previously dropped or expelled for non-payment of dues. The Administrator-Designee found that reinitiation was a virtually automatic act once the dues arrears had been paid. He found that these readmissions therefore do not "trigger" dates for back-pay liability. Of the several categories, the court believes that the only one which might constitute a triggering date for back pay would be admissions of non-minority B Branch members into the A Branch. However, as to this, the court accepts the Administrator-Designee's statement that he has found no instance where this would affect the entitlement of any member of the claimant class. (Fed.R.Civ.P. 53(e)(2)).

In his Final Report, the Administrator-Designee revised the starting dates for back pay with respect to 12 of the claimants following receipt of an affidavit submitted by the Union (the Ross Affidavit) stating:

A determination as to the correct starting date for back pay liability is obviously a significant threshold matter in the determination of back-pay awards for the successful claimants. In ruling on the Union's request (to revise the starting dates), the principles which I have applied are essentially as follows. If I assumed an individual to be a non-minority journeyman admitted to the union and that individual has been determined subsequently to have been something other than that (e.g., an apprentice, an admittee to the metal trades branch, etc.) then I have granted the Union's request and revised the starting date or "Phase II" eligibility date consonant with the reasoning of the May 14, 1985 decision. I have not, however, followed what might be termed the "domino effect" of a particular revision and moved persons for whom an appropriate eligibility date had already been fixed to a later date. This results, in some instances, in a finding that more than one claimant is "triggered" by a single particular non-minority admittee. While this is a further deviation from the rigid and mechanical application of the so-called "one to one" criteria discussed at pages 6 and 7 of the May 14, 1985 determination, it is a deviation which I adopted in the earlier decision in limited instances and a deviation which was found acceptable by the Court in affirming that determination.

Plaintiffs object to the 12 revised starting dates from those contained in the Administrator-Designee's report of July 10, 1984. The court has considered plaintiffs' objections and notes that in all cases the revised starting dates involve brief periods, the longest one being four months, and that the revised starting dates are substantially consistent with the formula previously used and do not materially affect the back-pay award to which a claimant is entitled. If, on the basis of subsequent information, the Administrator-Designee found that a previous date was not correct, it was appropriate for him to correct the date. The revisions in starting dates made by the Administrator-Designee are approved.

■ Plaintiffs, by their attorneys EEOC and NELP, object to the calculations of the Administrator-Designee of the lost back wages based on the average annual wages paid to members of the A Branch during the period of discrimination. They contend that the wages should have been calculated on a quarterly basis and that overtime should have been included.[1]

1. EEOC sets forth a schedule taken from this court's decision in 360 F.Supp. 979 (1973), ¶ 17 at page 986. This schedule lists overtime hours worked for the years 1967 to 1971. However, the significant unemployment of A Branch journeymen occurred subsequent to the period covered by these figures. While some journeymen may have received overtime on their 7-hour normal workday because of a favored position with their employer, many others did not, and

Plaintiffs seek further hearings on the procedure to be followed in determining back pay, at which they could offer expert testimony. However, more than ten years have elapsed since these proceedings started, during which there have been many hearings and plaintiffs have had every opportunity to present their position. Therefore, it is too late in the day for further hearings and plaintiffs' request is denied.

In his Report, the Administrator-Designee states:

> Testimony in connection with the Back wage calculation and in connection with the subsisting lawsuit and individual back-pay hearings made abundantly clear and it is undisputed that work opportunities were not consistent for journeymen steamfitters.

The Union had collective bargaining agreements with the Mechanical Contractors Association of New York, Inc. ("MCA") whose members were the employers who determined the job opportunities available to the Union's A Branch members. Thus, some members of the A Branch might have continuous employment, including overtime, while other members had extreme difficulty getting any employment at all. The Administrator-Designee noted in his Report:

> While some steamfitters were successful in obtaining long-term employment on major construction projects and earned consistent weekly wages (and in some cases, substantial overtime), many others were not successful and worked only several months of any year. Indeed, plaintiffs' counsel in addressing the issue of mitigation supplied substantial documentation on the issue of widespread unemployment in the building trades during a substantial part of the Back pay period.

There is no doubt that the period of discrimination here was also a period of substantial unemployment in the building industry in New York City. It was a par-

ticularly difficult period for steamfitters seeking employment. The court recalls being informed on one occasion that the only opportunity for new employment of steamfitters was in the construction of the ill-starred Shoreham nuclear power plant on Long Island. Moreover, the problem is complicated by the fact that the discriminatory practices found here were committed by a union which had no control over employment opportunities instead of by an employer which did. It seems to the court that it would be as unfair to compute average back wages based on the A Branch men who had full employment as it would be to base it on those who had none. The Administrator-Designee explained his procedure as follows:

> Having determined, after revising the back-pay eligibility dates, the earliest and latest dates on which back-pay was due, I then selected all non-minorities within the back-pay period and added non-minorities throughout the period whose term of employment coincided with successful claimants. In effect, the average back wage is determined by a data base produced from the wage data of the so-called "Triggering Persons." Once an individual was placed into the data base, the earnings for subsequent periods were also included. The average annual wage for the total back-pay period for all these non-minority individuals were [sic] determined and divided so as to create an average monthly wage. Where necessary, that figure was reduced still further to a daily rate to provide a more precise calculation of back-wages for the successful claimants.

The average struck by the Administrator-Designee on the basis of his calculations set forth in the endnote to his Report and accompanying tables A to D inclusive appear to the court to be as fair a solution as could be obtained under the circumstances. The average wage computations of the Administrator-Designee are approved.

the Union had no control with respect to the overtime its journeymen might earn. Therefore, the court does not think that the Adminis-

trator-Designee was required to factor in overtime into his calculations.

■ The Union contends that claimants who applied for membership in the A Branch after June 21, 1973, the date of the Judgment permanently enjoining the Union from continuing its unfair labor practices, cannot be considered for back pay. For example, two of the claimants, Lewis and Collazo, were found by the Administrator-Designee to have applied for membership in the A Branch after the Judgment of June 21, 1973. However, the Court of Appeals held that in determining eligibility for back pay, the date should be "the date of actual remedying of discrimination, rather than the date of the district court's order [Judgment]," citing *Patterson v. American Tobacco Co.*, 535 F.2d 257, at 268–269 (4th Cir.1976). 542 F.2d at 590. Therefore, the court finds that the Administrator-Designee properly allowed Lewis and Collazo to file claims for back pay.

The Administrator-Designee determined that the average annual wage during the back-pay period was $7,441.73. He added 30% for fringe benefits (welfare and pension 20% and vacation 10%), or $2,232.52 per year. In addition, the Administrator-Designee determined that a 7% welfare addition to back pay was appropriate, stating:

In a similar manner, I have determined that a 7% welfare addition to Back-pay is appropriate, though I recognize that no argument was made with regard to welfare payments particularly, nor was any argument made with regard to the value of comparable medical insurance or the cost to back pay claimants which may have been incurred by reason of not having such protection. As attenuated as such arguments may seem, my inclusion of a 7% portion of the fringe benefits as attributable to welfare fund payments is not intended to create any liability on the part of the welfare fund which is essentially an insurance-type benefit and the payment of these sums is intended to be the total liability of the Union or the Welfare Fund in connection with Welfare Plan coverage.

■ Title 42 Section 2000e–5(g) of the United States Code provides that "amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise allowable." The Administrator-Designee was required by this section to deduct in each instance from the amount computed as claimant's back pay the amount which he found was earned or was earnable by the claimant with due diligence during the period of discrimination. The amounts so determined (denominated "interim earnings") were deducted from the gross back pay to which each claimant was entitled.[2] The parties have referred to this procedure as "mitigation."

Hearings were held by the Administrator-Designee and mitigation was determined on a case-by-case basis. The information which had been accumulated in the Phase I hearings regarding work history, as well as at the hearings held in the course of Phase II, were utilized for this purpose by the Administrator-Designee. In view of the fact that a union and not an employer is charged with discrimination, the court finds that the calculations made here on the basis of the data which was collected were in accordance with the requirements of the statute. Having carefully reviewed each case, the deductions for mitigation (wages earned or earnable) are approved.

■ In his Report, the Administrator-Designee leaves it up to the court to determine whether pre- or post-judgment interest should be included in the back-pay awards. Plaintiffs urge that both pre- and post-judgment interest should be included in the awards, while the Union contends that no interest should be included. It is appropriate to include pre-judgment interest in a back-pay award (*Donovan v. Sovereign Security Ltd.*, 726 F.2d 55 (2d Cir. 1984)). Interest shall be included on each of the awards at the legal rate prevailing in

---

**2.** One claimant (Alexander) voluntarily terminated his (outside) employment during the back pay period. Wages which he would have earned except for the voluntary termination were deducted from his gross pay if his subsequent reported earnings were less.

the State of New York (NY CPLR § 5004).[3] Interest on each award will run from the concluding date of the gross back pay period to the date of the Judgment to be entered herein.

The court appreciates the thorough briefs which have been filed by EEOC, NELP, and the Union. It has carefully considered the objections of EEOC and NELP.

This has been a long and difficult period for all concerned. Following careful consideration, the court finds that the Administrator-Designee has done a commendable and thorough job, and approves the Final Report filed July 22, 1986 and the awards to the claimants contained therein, to which pre-judgment interest will be added as above set forth.

The parties are requested to settle a Judgment within 15 days.

It is So Ordered.

By Memorandum and Order filed November 18, 1986, the court approved the Final Report of the Administrator-Designee filed July 22, 1986. The court directed that pre-judgment interest be paid on each award allowed by the Administrator-Designee, to run from the concluding date of the gross back pay period to the date of the judgment to be entered herein, at the legal rate prevailing in the State of New York (NY CPLR § 5004). Plaintiffs, by Equal Employment Opportunity Commission ("EEOC") and National Employment Law Project, Inc. ("NELP") have moved for reconsideration. Plaintiffs urge the court to apply prejudgment interest on each award at the adjusted prime rate provided in Section 6621 of Title 26 of the United States Code. Plaintiffs argue that in discrimination cases the adjusted prime rate should be applied rather than the New York legal rate.

Defendant Local 638 has filed a Memorandum in opposition, dated December 4, 1986, taking the position that Plaintiffs'

motion for reconsideration should be denied or, in the alternative, the award for prejudgment interest should be vacated.

Plaintiffs rely on the recent case of *E.E. O.C. v. County of Erie*, 751 F.2d 79 (2d Cir.1984) in which the Court of Appeals affirmed a district court decision applying the adjusted prime rate in a discrimination case. The Court stated:

> Since the goal of a suit under the FLSA and the Equal Pay Act is to make whole the victims of the unlawful underpayment of wages, and since the adjusted prime rate has been adopted as a good indicator of the value of the use of money, it was well within the discretion of the district court to order that the rate of prejudgment interest to be paid by the defendants on the backpay awards be the adjusted prime rate.

Here, the goal is to make whole the victims of racial discrimination. This discrimination occurred many years ago, but its victims have yet to be compensated. Therefore, there is ample reason here, as in *Erie*, to apply the adjusted prime rate in determining prejudgment interest.

In a recent case in the Eastern District of New York, *Orshan v. Macchiarola*, 629 F.Supp. 1014 (E.D.N.Y.1986), Judge Neaher followed *Erie* and applied the adjusted prime rate rather than New York law to prejudgment interest on a jury award. Other recent cases involving discrimination have also applied the adjusted prime rate. *EEOC v. Wooster Brush Company Employees Relief Association*, 727 F.2d 566, 579 (6th Cir.1984); *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 572 F.Supp. 494 (D.Conn.1983) *EEOC v. Pacific Press Publishing Association*, 482 F.Supp. 1291, 1319–20 (N.D.Cal.1979), *aff'd*, 676 F.2d 1272 (9th Cir.1982); *Donovan v. Agnew*, 552 F.Supp. 1027, 1029 (D.Mass.1982).

Plaintiffs' motion for reconsideration is granted to the extent that each award shall include prejudgment interest at the adjust-

---

**3.** The court understands that the legal rate in New York was 6% per annum to June 25, 1981 and 9% per annum thereafter.

ed prime rate determined in accordance with Title 26, Section 6621 of the United States Code, computed from the concluding date of the gross back pay period to November 30, 1986.

Settle final judgment accordingly within 10 days.

It is SO ORDERED.