**Douglas McINTOSH, Plaintiff,**

v.

**IRVING TRUST COMPANY, Defendant.**

No. 87 Civ. 6741 (JGK).

United States District Court,
S.D. New York.

Jan. 25, 1995.

---

Vladeck, Waldman, Elias & Engelhard, P.C. by Julian R. Birnbaum, Suja A. Thomas, New York City, for plaintiff.

Proskauer Rose Goetz & Mendelsohn by Howard L. Ganz, Aaron J. Schindel, Jennifer A. Borg, New York City, for defendant.

## OPINION AND ORDER

KOELTL, District Judge:

The plaintiff, Douglas McIntosh, brought this action against his former employer, Irving Trust Company ("the Bank") on September 4, 1987. The plaintiff, who is African American, alleged that the Bank had intentionally discriminated against him because of his race by failing to promote him from the position of Customer Relations Assistant ("CRA") to that of Assistant Secretary and by terminating him. The plaintiff also alleged that the defendant intentionally retaliated against him by continuing to deny him a promotion, by disciplining him and by terminating him after he complained of discrimination. The plaintiff brought his claims pursuant to 42 U.S.C. § 1981 [1], Title VII of the Civil Rights Act of 1964 [2] and the New York Human Rights Law.[3]

1. 42 U.S.C. § 1981 provides, in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (1994). The plaintiff claimed that the Bank's failure to promote him based on his race was cognizable under Section 1981 because a promotion from CRA to Assistant Secretary constituted an opportunity for a new and distinct relation between the plaintiff and the Bank. See Patterson v. McClean Credit Union, 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989).

2. This case was brought under Title VII prior to the 1991 amendments; therefore, the plaintiff did not have the right to a jury trial and he is not entitled to compensatory damages or punitive damages under Title VII. See Postema v. National League of Professional Baseball Clubs, 998 F.2d 60, 61–62 (2d Cir.1993) (jury trial and damages provisions of the 1991 Act are not retroactive); Carrero v. New York City Housing Auth., 890 F.2d 569, 581 (2d Cir.1989) (no compensatory or punitive damages are recoverable under Title VII prior to the 1991 amendments).

The sections of Title VII pursuant to which the plaintiff brought his claims of discrimination and retaliation were unchanged by the 1991 amendments. Section 2000e-2 of Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]

42 U.S.C. § 2000e-2(a)(1) (1994).

And, Section 2000e-3 provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter.

42 U.S.C. § 2000e-3(a) (1994).

3. The New York Human Rights Law provides, in relevant part, that it is unlawful for an employer, "because of the ... race ... of any individual, ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." New York Exec. Law § 296(1)(a) (McKinney 1993). It is also unlawful under the Human Rights Law for an employer to "discharge, expel or otherwise discriminate

Following an eight-day trial, the jury rendered a special verdict for the plaintiff under the New York Human Rights Law, finding that the plaintiff was terminated in retaliation for his complaints of discrimination and awarding him $310,000.00 in back pay and $219,428.00 in compensatory damages. The jury determined, under the New York Human Rights Law, that McIntosh was not discriminated against because of his race when the Bank failed to promote him and when it terminated him.[4]

The parties have made several applications to the Court in connection with the judgment to be entered. The issues related to the judgment include: first, whether to adopt the jury's verdict in entering the Court's findings under Title VII; second, whether to award reinstatement to the plaintiff as additional relief under Title VII; third, whether to purge the defendant's personnel files pertaining to the plaintiff's employment as additional relief under Title VII; and fourth, whether to award prejudgment interest on any portion of the plaintiff's damages and, if so, what the appropriate interest rate and method of computation are.

### I.

Following his graduation from Pace University where he had earned an M.B.A. in corporate finance, the plaintiff was hired in October, 1984 as a lending officer trainee in the Bank's Professional Banking Officer Development Group Training Program. The plaintiff was one of two African Americans in his training class of twenty-five people. The training program lasted for approximately one year, after which time those members who graduated became CRAs. CRAs were placed in various areas of the Bank. The next step up the ladder for a CRA was to become an Assistant Secretary. Assistant Secretary was an officer position at the Bank; Assistant Secretaries had authority to bind the Bank to financial commitments.

In December, 1985, following completion of the training program, McIntosh became a CRA and he was placed in Area III of the Commercial Banking Division. His duties, like the duties of the other CRAs, included preparing credit analyses, investigating and analyzing the requirements of current customers, servicing the daily needs of customers, soliciting new business and preparing various internal credit, marketing and profit reports.

On October 1, 1986, two white CRAs who had completed the training program in the training class after the plaintiff's were promoted to Assistant Secretary; the plaintiff had not, as of that date, been promoted. McIntosh subsequently spoke with his supervisor and asked her why he had not yet been promoted to Assistant Secretary while trainees in both his and the subsequent training class had been promoted. While there was no set time within which a CRA was assured a promotion to Assistant Secretary, and promotions depended both on the performance of the CRA and the needs of the various areas of the Bank, the plaintiff believed, based on his performance and the feedback that he had received, that he should have been promoted by that time and that he was not promoted because of his race.

At trial, McIntosh testified about the discriminatory atmosphere he perceived at the Bank and about incidents that led him to believe that he was treated differently on account of his race. He testified that as of December of 1986, all of the members of his training class had been promoted to Assistant Secretary with the exception of the other African American trainee in his class and himself. He also testified to the various complaints of discrimination he made. On December 2, 1986, he complained to the Irving Trust Equal Employment Opportunity Officer, Anne Williams, that he had not been promoted because of his race and that Afri-

---

against any person because he has opposed any practices forbidden under [the Human Rights Law] or because he has filed a complaint ... under [the Human Rights Law]." New York Exec.Law § 296(1)(e) (McKinney 1993).

4. Because the jury found that the Bank did not fail to promote McIntosh because of his race, there was no cognizable claim under Section 1981, and the jury never reached the question of whether the promotion from CRA to Assistant Secretary constituted a new and distinct relation such that Section 1981 would apply.

can American trainees, in general, were promoted to officer positions more slowly than white trainees were. On December 9, 1986, he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") making the same allegations. And, on January 20, 1987, he wrote a letter to the chairman of the Bank complaining of discriminatory treatment.

On March 2, 1987, McIntosh met with his supervisor; she gave him a written reprimand, a negative performance evaluation and a warning to improve his performance. The reprimand listed twenty-two "corrective action tasks" that the plaintiff was instructed to complete. The plaintiff also received additional warnings.

The plaintiff amended his EEOC charge to include a claim of retaliation on March 10, 1987. On April 8, after several incidents involving missed deadlines and other problems with various projects and assignments, the plaintiff's supervisor gave him a final warning. The plaintiff, in turn, amended his EEOC charge to allege additional instances of retaliation. On April 29, 1987, the Bank terminated McIntosh's employment. McIntosh again amended his EEOC retaliation charge on May 14, 1987 to include his termination.

At trial, the witnesses testified to radically different versions of what happened between October, 1986 and April, 1987. The plaintiff testified, at great length, that until he asked about his promotion, he enjoyed a good working relationship with his supervisor. He further testified that until that time, he had not received any criticism of his work and that all of the feedback he had received had been positive. He testified that after he asked his supervisor about his promotion, her attitude towards him began to change, worsening dramatically after he filed his complaints of discrimination. He testified that she was extremely abrupt with him, made unreasonable demands of him and embarrassed him in front of his colleagues. He testified that the list of corrective action tasks in the reprimand were impossible to complete within the time allotted and that they were, in effect, a set-up for his termination.

The supervisor testified, also at great length, to a much different version of events. She testified that the plaintiff's work often fell below the Bank's expectations; specifically, she testified that the plaintiff missed crucial deadlines, made serious errors in his credit analyses and exhibited a negative attitude. She further testified that, rather than mistreat the plaintiff, she had tried to help him improve his performance. McIntosh's supervisor explained that she, along with the plaintiff's team leader, had tried to work closely with the plaintiff in order to save his career, and not to destroy it. She testified that the tasks detailed in the reprimand were meant to enable the plaintiff to reestablish himself and move forward. She further testified that despite her encouragement, the plaintiff's poor attitude and quality of work resulted in her ultimate recommendation that he be terminated.

While the plaintiff's supervisor denied having humiliated the plaintiff in front of other members of the department, another former employee of the Bank, who had no motive to testify falsely and whose testimony was credible, confirmed the plaintiff's account of such an incident. Additionally, that former employee supported McIntosh's testimony that the list of corrective action tasks could not be accomplished in the time allotted to him. This testimony was strongly supportive of McIntosh's position that his supervisor—after he had complained about discrimination and filed a charge with the EEOC—was creating a paper trail to support a pretextual reason for his termination.

The plaintiff's supervisor testified that when she became aware of the plaintiff's complaint to the EEOC, she was simply "sad" and "surprised" rather than angry. The jury was entitled to disbelieve that testimony, which strained credulity, and conclude, based upon all of the evidence, that the plaintiff had proved that his termination was in retaliation for his complaints about discrimination against him.

Based on the evidence presented at trial, and having been instructed on the law and

the appropriate burdens of proof[5], the jury assessed the credibility of the witnesses and found that the Bank did not discriminate on the basis of the plaintiff's race either in deciding not to promote the plaintiff to the position of Assistant Secretary or in deciding to discharge him. The jury did conclude, however, that the Bank retaliated against the plaintiff for having complained of discrimination. It awarded the plaintiff $310,000.00 in back pay and $219,428.00 in compensatory damages.

The parties have agreed that the Court should adopt the jury's findings under the New York Human Rights Law in entering judgment under Title VII. The parties also have agreed that no further findings of fact and conclusions of law are necessary because the Court, sitting in equity to determine the plaintiff's Title VII claims, is bound by the jury's factual findings on the plaintiff's Section 1981 and Human Rights Law claims. *See Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1048 (2d Cir.1992) (court must make findings on Title VII claims in accordance with the jury's determination on Human Rights Law claims).

In *Wade v. Orange County Sheriff's Office*, 844 F.2d 951 (2d Cir.1988), the Court of Appeals for the Second Circuit explained:

> When an action involves both legal and equitable claims that have common issues of fact, and a jury trial has been properly demanded with respect to the legal claims, the parties have a right under the Seventh Amendment to have the legal claims tried to a jury.... To safeguard this right, the general rule is that the jury must decide the legal claims prior to the court's determination of the equitable claims.

*Id.* at 954 (citations omitted). The court went on to explain that when the jury has decided a factual issue under 42 U.S.C. § 1981, the court is precluded from reaching a contrary decision on that issue under Title VII. *Id.; see also In re Lewis*, 845 F.2d 624, 629 (6th Cir.1987) ("One important reason that a judge is not to make findings that contravene a jury's verdict is that the verdict is res judicata with respect to the factual issues which would have necessitated jury resolution.").

In making its findings under Title VII, the Court, therefore, adopts the jury's finding that the Bank retaliated against the plaintiff for having complained of discrimination and will enter judgment accordingly in the amount of damages specified by the jury.[6] Moreover, the Court will dismiss the plaintiff's remaining claims of discrimination under Title VII, consistent with the jury's findings that the defendant did not unlawfully discriminate against the plaintiff because of his race either in deciding not to promote him or in deciding to terminate him. The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## II.

The plaintiff has asked the Court, in its equitable discretion under Title VII, to grant him reinstatement and to purge the defendant's personnel files pertaining to his em-

---

5. The charge to the jury closely followed recent cases decided by the Supreme Court and the Court of Appeals for the Second Circuit. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171 (2d Cir.1992).

6. As noted above, retaliation is a violation of Title VII as well as a violation of the New York Human Rights Law. Title VII provides, in pertinent part:

   > It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment prac-

tice by this subchapter, or because he has made a charge ... under this subchapter.
42 U.S.C. § 2000e–3(a) (1994).

   The plaintiff is not seeking compensatory damages under Title VII because his relief under the preamendment statute is limited to back pay, along with equitable relief that the Court finds appropriate. *See United States v. Burke*, 504 U.S. 229, —, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34 (1992) ("Title VII does not allow awards for compensatory or punitive damages; instead, it limits available remedies to backpay, injunctions, and other equitable relief.") (citations omitted); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 581 (2d Cir.1989) (no compensatory or punitive damages recoverable under Title VII prior to the 1991 amendments).

ployment. For the reasons discussed below, the Court concludes that reinstatement would be an inappropriate remedy in this case, but that the files should be purged.

## A.

■ In *Equal Employment Opportunity Comm'n v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977), Judge Weinfeld explained when reinstatement is an appropriate remedy under Title VII:

Like the other remedies available under Title VII, reinstatement is not mandatory upon a finding that an employee has been discriminatorily discharged, but is an equitable remedy whose appropriateness depends upon the discretion of the court in the light of the facts of each individual case. However, since the purpose of reinstatement is to make the plaintiff whole for the injury she has suffered, it, like back pay, should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Id.* at 926 (citations omitted).

Reinstatement is often appropriate as the means to make a plaintiff whole for the unlawful discrimination that the plaintiff has suffered and to place the plaintiff in the same position that the plaintiff would have been in absent the discriminatory conduct. *See, e.g., In re Lewis*, 845 F.2d 624, 630 (6th Cir.1987) (noting that limited grounds exist upon which reinstatement may be denied); *cf. Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir.1984) (reinstatement is not possible where there exists intense animosity between the employer and the employee). However, in the circumstances of this case, the Court finds that the plaintiff has been made whole by the damages already awarded by the jury and the Court. Granting reinstatement, therefore, would result in an unjustified windfall for the plaintiff without advancing the purposes of the statute.

When the plaintiff was terminated on April 29, 1987, he was earning $35,574.48 per year. The plaintiff presented evidence that a co-worker who remained at the Bank received bonuses and raises after the plaintiff's termination and urged the jury to take that into account in determining lost wages. The jury ultimately awarded $310,000.00 in back pay and specifically found that the plaintiff was entitled to no front pay.

The jury was specifically instructed that it should award the plaintiff an amount sufficient to make him whole—exactly the same standard which the Court uses in determining what constitutes appropriate equitable relief. The jury was charged:

If you find that the defendant Irving Trust intentionally discriminated against the plaintiff Douglas McIntosh because of his race, or retaliated against him for complaining of racial discrimination, then you must determine an amount that is fair compensation for the plaintiff's damages. . . . The damages that you award must be fair compensation—no more and no less. The purpose of the law is to make the plaintiff whole—to put him in the same position that he would have been in had there been no discrimination or retaliation.

The jury also was instructed that it could award damages for future pecuniary losses caused by the defendant's illegal acts; however, it found no such losses.

The jury was instructed further that it should consider the defendant's duty to mitigate in determining the amount of back pay as follows:

A plaintiff has a duty to mitigate damages by using reasonable care and diligence in seeking suitable alternative employment. A plaintiff need not go into another line of work, accept a demotion, or take a demeaning position, but must use reasonable care and diligence in seeking a job substantially equivalent to the one that was lost. The burden of proof is on the defendant to prove, by a preponderance of the evidence, that the plaintiff has failed in his duty to mitigate. If you find that the plaintiff failed to use such reasonable care and diligence, then you will reduce the award by the amount the plaintiff could

have earned by using such care and diligence. The defendant's burden of proving lack of diligence is not satisfied merely by showing that there were further actions that the plaintiff could have taken in pursuit of employment. Rather, the defendant must show that the course of conduct actually followed was so deficient as to constitute an unreasonable failure to seek employment.

In this case, there was substantial evidence that the plaintiff had failed to mitigate his damages and should have found another comparable position before trial. For example, McIntosh testified about his unsuccessful efforts to obtain employment since his termination and about his recent formation of his own company. He testified that, throughout the course of this litigation, he never asked people with whom he had positive working relationships from his employment at the Bank to help him obtain a new job; he explained that he did not do so because these people would be witnesses at his trial and he did not want to compromise their impartiality or appearance thereof. McIntosh's testimony also demonstrated that he apparently left much of his job search to employment firms and that he did not personally follow up on his search to any great extent.

The jury plainly determined, in accordance with the instructions it was given, that an award of many years' salary to the plaintiff was sufficient to make him whole, that no award of future damages was necessary to make him whole and that the plaintiff should have obtained a new position prior to the trial.

Likewise, the Court concludes that the award of many years of back pay is sufficient to make the plaintiff whole. In addition, as discussed below, the Court will award prejudgment interest on the back pay award to ensure that it is sufficient relief to make him whole. Any further award of reinstatement would be in excess of that necessary to make the plaintiff whole and this Court, in its discretion, declines to order such an excessive award. *See, e.g., Barbano v. Madison County,* 922 F.2d 139, 146–47 (2d Cir.1990) (no abuse of discretion in the trial court's determination that a prevailing gender dis-

crimination plaintiff was made whole by an award of back pay of almost eight and one half years, prejudgment interest and attorney's fees and that she was not entitled to front pay or an injunction that she be hired upon the next available vacancy); *Equal Employment Opportunity Comm'n v. General Lines, Inc.,* 865 F.2d 1555, 1561, 1565 (10th Cir.1989) (affirming the district court's denial of front pay and reinstatement and its finding that the award of back pay would deter future unlawful employment actions by the defendant, promote equal employment opportunity and compensate the plaintiffs).

In *Rzanca v. Kimberly–Clark Corp.,* 889 F.2d 1088 (no published opinion), 1989 WL 142053 (6th Cir.1989) (per curiam), a case decided under a Michigan civil rights statute prohibiting discrimination on the basis of handicap, the Court of Appeals for the Sixth Circuit affirmed the district court's denial of reinstatement under circumstances almost identical with those of the present case. 1989 WL 142053 at **3. The jury had found that the plaintiff was not entitled to any future pecuniary damages. *Id.* The court explained:

> In a suit in federal court where both legal and equitable relief is sought, a judge must, as a matter of federal law, make findings on equitable claims that are consistent with the jury's findings on legal claims.... *While not always dispositive in determining the propriety of reinstatement, we note the jury specifically found that [the plaintiff] was entitled to no future damages.* In order to determine future damages, the jury was instructed to ascertain 'such sum as will reasonably compensate the Plaintiff for any loss of future earning power proximately caused by the injury in question which you find from the evidence in the case the [p]laintiff is reasonably certain to suffer.' ... Normally, an award of front pay obviates reinstatement, and vice versa.... *In view of the factors the jury considered in determining [the plaintiff's] future loss, we believe that the court's denial of reinstatement comports with the jury's verdict.*

*Id.* (citations omitted) (emphasis added). So, while this Court may not be bound to deny

reinstatement because the jury denied front pay, the jury's verdict lends significant support to this Court's independent conclusion that the plaintiff already has been made whole and that, in the exercise of discretion, reinstatement should not be awarded.

In *McKnight v. General Motors Corp.*, 973 F.2d 1366 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993), the Court of Appeals for the Seventh Circuit noted that "[d]amages in employment discrimination cases are not intended to insure a plaintiff's future financial success. 'Damages should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended.'" *Id.* at 1371 (citations omitted). Here, the effects of the defendant's retaliation have ceased and the plaintiff's failure to find additional employment is properly attributable to his failure to mitigate his damages as the law requires.

Therefore, the Court denies the plaintiff's request for reinstatement.

### B.

■ The Court grants the plaintiff's request that the defendant purge its personnel files. This is appropriate relief because it precludes further retaliatory conduct by preventing any reliance on discriminatory evaluations and records.[7] *See, e.g., Smith v. Secretary of the Navy*, 659 F.2d 1113, 1114 (D.C.Cir.1981) (prevailing Title VII plaintiff who was subject to discriminatory evaluations was entitled to have discriminatory records purged from the personnel file). The defendant is ordered to remove from its personnel files any and all reprimands, evaluations and other items of that nature dated from December 2, 1987 onward.[8]

### III.

The plaintiff seeks prejudgment interest on the jury's awards of back pay and compensatory damages. This request raises four main issues: first, whether to award prejudgment interest on the jury's back pay award; second, whether to award prejudgment interest on the jury's compensatory damages award; third, the appropriate rate of prejudgment interest; and fourth, the appropriate method of computation of prejudgment interest.[9]

### A.

■ It is within this Court's sound discretion to award prejudgment interest on the plaintiff's back pay damages. In *Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), the Supreme Court noted that in Title VII suits, prejudgment interest on back pay awards "of course, is an 'element of complete compensation.'" *Id.* at 558, 108 S.Ct. at 1971 (citing *West Virginia v. United States*, 479 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987)). Title VII authorizes interest awards as "a normal incident of suits against private parties[.]" *Id.* In *Clarke v. Frank*, 960 F.2d 1146 (2d Cir.1992), the Court of Appeals for the Second Circuit affirmed the district court's award of prejudgment interest under Title VII on the plaintiff's back pay award. The court explained:

> Prejudgment interest discourages an employer from attempting to 'enjoy an interest-free loan for as long as [it can] delay paying out back wages.' ... Thus, we have held that 'it is ordinarily an abuse of discretion not to include pre-judgment interest in a backpay award....'

*Id.* at 1153–54 (citations omitted).

In *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831 (2d Cir.), *cert. denied*, — U.S.

---

7. Because of the merger between Irving Trust Company and the Bank of New York subsequent to the events at issue in this litigation, the relevant personnel files currently may be maintained by the Bank of New York as successor to the Irving Trust Company. Whatever files remain pertaining to the plaintiff, wherever they are kept, should be reviewed and purged.

8. December 2, 1987 is the date upon which the plaintiff complained of discrimination to the Bank's Equal Employment Opportunity Commission Officer.

9. The parties agreed during trial that the issue of whether to award prejudgment interest, as well as the amount of prejudgment interest, should be decided by the Court after the jury reached a verdict.

———, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992), a case decided under the Labor Management Relations Act, the Court of Appeals discussed the relevant factors to be applied in making a discretionary award of prejudgment interest:

> [T]he award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Id.* at 833–34 (citing, *inter alia, Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988)).

There are no extraordinary reasons to depart from the cases which have authorized prejudgment interest on back pay awards in Title VII cases. Interest is necessary to place the plaintiff in the position he would have been in had he received his salary when it was owed and had he not been terminated. This case has been pending for over seven years through no fault of the parties and the defendant should not have the benefit of the use of the funds that should have been paid to the plaintiff. The purposes of Title VII—to deter violations of the statute and to make the plaintiff whole—are both served by a prejudgment interest award on the back pay portion of the damage award.

The defendant's arguments why this Court should deny prejudgment interest on the back pay award are unpersuasive. As the plaintiff has argued, the cases the defendant cites in support of its argument are not controlling. *See, e.g., Lodges 743 and 1746, Int'l Assoc. of Machinists and Aerospace v. United Aircraft Corp.,* 534 F.2d 422, 447 (2d Cir.1975) (noting that it might be inequitable to award prejudgment interest where there was "inordinate delay in prosecution of a suit or wrongdoing by the plaintiff"), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); *Proulx v. Citibank,* 681 F.Supp. 199, 205 (S.D.N.Y.) (Mukasey, J.) (explaining the extraordinary circumstances that justified the denial of prejudgment interest), *aff'd without op.,* 862 F.2d 304 (2d Cir.1988).

Much of the defendant's argument against prejudgment interest comes down to the unappealing innuendo that the plaintiff really brought all of his troubles upon himself. The defendant reasons that, since the jury found that the Bank did not discriminate against the plaintiff in failing to promote him or in terminating him, if only the plaintiff had kept quiet, he still would be working at the Bank. In other words, it is all the plaintiff's fault, according to the Bank. This argument is blatantly wrong. The plaintiff had every right to complain about discrimination so long as he had a good faith and reasonable belief that the Bank was discriminating against him. *See Sumner v. United States Postal Service,* 899 F.2d 203, 209 (2d Cir. 1990). The Bank has never challenged the reasonableness or good faith of the plaintiff's belief. Terminating the plaintiff in retaliation for those complaints was unlawful, and the defendant's attempts to excuse its unlawful behavior ignore the jury's determinations that the Bank violated the law by firing the plaintiff in retaliation for his complaints of discrimination and that the Bank is liable for the damages resulting from that unlawful termination.

The Court will, therefore, award prejudgment interest on the back pay damage award.

### B.

■ McIntosh also has asked the Court to award prejudgment interest on the $219,-428.00 compensatory damage award under the New York State Human Rights Law.[10] However, while prejudgment interest is recoverable in contract and property actions under New York law, it is not recoverable in

---

**10.** While back pay is awarded under both Title VII and the New York Human Rights Law, the compensatory damage award is made solely under the New York Human Rights Law because compensatory damages for pain and suffering are not recoverable under Title VII as it existed prior to the 1991 amendments. *See, e.g., Poste-* *ma v. National League of Professional Baseball Clubs,* 998 F.2d 60, 61–62 (2d Cir.1993) (jury trial and damages provisions of the 1991 Act are not retroactive); *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 581 (2d Cir.1989) (damages for pain and suffering are unavailable under the pre-amendment statute).

personal injury actions. *See* N.Y.Civ.Prac.L. & R. § 5001 (McKinney 1992); *see also Orsini v. Kugel,* 9 F.3d 1042, 1048 (2d Cir.1993). Accordingly, in *Rodick v. Schenectady,* 856 F.Supp. 105 (N.D.N.Y.1994), the court held that compensatory damages awarded on a claim for malicious prosecution were not entitled to prejudgment interest under New York law. *Id.* at 107; *see also Murphy v. Murphy,* 109 A.D.2d 965, 967 n. 1, 486 N.Y.S.2d 457, 459 n. 1 (3d Dep't 1985) (noting that "the parties correctly agree that interest to the date of verdict on the award for intentional infliction of severe emotional distress is not available [under Section 5001(a) ].").[11]

■ Despite the plaintiff's arguments to the contrary, the reasons for limiting prejudgment interest under CPLR § 5001 to contract and property actions apply with particular force here. The jury has determined the amount of back pay that the plaintiff has lost and the plaintiff will receive compensation in that amount, together with prejudgment interest. That award is calculable by reference to the specific amounts of money the plaintiff has lost and the defendant has withheld. An award of compensatory damages for pain and suffering, on the other hand, is not so easily calculated and represents the jury's translation into monetary terms a loss that is difficult to quantify. It is not easily divided into specific periods like back pay and it does not represent an amount that the defendant has withheld from the plaintiff in the same way that awards in contract or property actions do. *See* 5 Jack B. Weinstein et al., New York Civil Practice § 5001.07 (1994) (rationales for the exclusion of personal injury actions from Section 5001 include the difficulty in calculating such damages and the fact that the jury will consider interest and delays in collection in calculating the plaintiff's losses); *cf. Miner v. City of Glens Falls,* 999 F.2d 655, 662 (2d Cir.1993) (affirming award of prejudgment interest on the back pay component of an award under 42 U.S.C. § 1983 because the defendant had enjoyed full use of the money that otherwise would have been the plaintiff's salary). Ac-

cordingly, the plaintiff was unable to cite to the Court even one comparable case where prejudgment interest was recoverable on analogous damages under Section 5001.

The Court will not, therefore, award prejudgment interest on the plaintiff's compensatory damages.

C.

■ The appropriate rate of prejudgment interest on the back pay award is within the Court's discretion. In *Frank v. Relin,* 851 F.Supp. 87 (W.D.N.Y.1994), a case decided under 42 U.S.C. § 1983, the court noted that the Court of Appeals for the Second Circuit has not "expressly endorsed any particular interest rate[,]" and observed that "[c]ourts in this and other circuits have used various interest rates including the postjudgment interest rate provided in 28 U.S.C. § 1961(a) [the treasury bill rate], statutory interest rates, or market rates." *Id.* at 91 (citations omitted). The court applied the postjudgment treasury bill rate on the back pay award in that case. *Id.; see also Equal Employment Opportunity Comm'n v. County of Erie,* 751 F.2d 79, 82 (2d Cir.1984) (using adjusted prime rate of prejudgment interest on back pay awarded in wage discrimination case held not to be an abuse of discretion); *Malarkey v. Texaco, Inc.,* 794 F.Supp. 1237, 1243 (S.D.N.Y.1992) (Mukasey, J.) (applying New York statutory rate seemingly without objection from the defendant), *aff'd,* 983 F.2d 1204 (2d Cir.1993); *Danna v. New York Tel. Co.,* 755 F.Supp. 615, 617 n. 3 (S.D.N.Y.1991) (Motley, J.) (applying federal short-term rate); *Rios v. Enterprise Assoc. Steamfitters,* 651 F.Supp. 109, 115–16 (S.D.N.Y.1986) (applying adjusted prime rate provided in 26 U.S.C. § 6621 instead of New York statutory rate), *rev'd in part on other grounds,* 860 F.2d 1168 (2d Cir.1988).

Using the United States treasury bill rate referred to in 28 U.S.C. § 1961 is appropriate in this case. The plaintiff urges that the Court use the New York statutory interest

**11.** The award of prejudgment interest on a state law claim is governed by state law. *See, e.g., McCoy v. Goldberg,* 810 F.Supp. 539, 546 (S.D.N.Y.1993) (Conner, J.) (securities law); *Malson Ltd. v. Liberty Mut. Fire Ins. Co.,* No. 84 Civ. 1717, 1986 WL 2963, *1 (S.D.N.Y. March 3, 1986) (Metzner, J.) (breach of contract).

rate of nine percent per year. *See* N.Y.Civ. Prac.L. & R. § 5004 (McKinney 1992). However, the average United States treasury bill rate applicable from the time of the plaintiff's discharge to December 31, 1994—which the parties have stipulated to be 6.17%—is more appropriate. That rate more adequately ensures that the plaintiff is sufficiently, but not overly, compensated. Treasury bill rates have fluctuated during this seven-year period from as low as 3.13% to as high as 9.51%. Using the average rate provides the plaintiff with an amount that he could have obtained on a relatively safe investment while taking into account the effects of inflation and the fluctuation in the rate over the long period of time involved. It accomplishes the goal of making the plaintiff whole. *See, e.g., Hollie v. Korean Air Lines Co., Ltd.*, 834 F.Supp. 65, 71 (S.D.N.Y.1993) (Buchwald, M.J.); *Ingersoll Milling Mach. Co. v. M/V Bodena*, Nos. 80 Civ. 6729, 81 Civ. 4744, 1986 WL 172, *3 (S.D.N.Y. Feb. 27, 1986) (Carter, J.).[12]

In *Conway v. Electro Switch Corp.*, 825 F.2d 593 (1st Cir.1987), the court made a similar decision in analogous circumstances in deciding to apply the federal treasury bill rate instead of the Massachusetts interest rate, even though the plaintiff had recovered under both Title VII and the Massachusetts civil rights statute. *Id.* at 602. The Court of Appeals explained:

> [A]lthough the federal judgment rate is lower than the rate available under the Massachusetts civil interest statutes, the choice of the appropriate percentage [necessary to make the plaintiff whole] was committed to the district judge's discretion and we cannot say that the court's adoption of a lower but equally applicable interest rate by itself constitutes an abuse of the court's considerable discretion.

*Id.* at 602.[13]

### D.

■ In order to calculate prejudgment interest, it is necessary to spread the jury's award of $310,000.00 of back pay over the period of time from the plaintiff's termination on April 29, 1987 to the date the judgment is

---

12. The Court of Appeals for the Second Circuit recently approved, as a matter of the district court's discretion, the use of the federal statutory rate of 3.58% for prejudgment interest, as opposed to the much higher Vermont statutory rate of 12%, in a tortious interference with contract case. *See Chandler v. Bombardier Capital Inc.*, 44 F.3d 80 (2d Cir.1994). The court explained that the application of the lower federal rate to the entire amount of the award from the date of the discharge was within the district court's discretion. *Id.*, 44 F.3d at 84.

13. The plaintiff relies on *Doty v. Sewall*, 908 F.2d 1053 (1st Cir.1990), in support of his argument that the New York nine percent rate of prejudgment interest should apply because his claim was brought under the New York Human Rights law, as well as Title VII. Several factors make *Doty* distinguishable. First, the issue in Doty was *whether* to apply prejudgment interest, *id.* at 1063; the issue here is what rate of prejudgment interest to apply.

Second, *Doty* was a case where prejudgment interest was mandatory under state law but discretionary under federal law. *Id.* at 1063, 1063 n. 9. In the present case, on the other hand, prejudgment interest would not be available under state law because, as discussed above, prejudgment interest is not available under New York law in personal injury actions. *See, e.g. Davis v. Rosenblatt*, 159 A.D.2d 163, 172–73, 559 N.Y.S.2d 401, 406 (3d Dep't 1990) (no prejudgment interest on back pay awarded on equal protection claim); *cf. State Div. of Human Rights v. New York State Dep't of Correctional Servs.*, 90 A.D.2d 51, 59 n. 3, 456 N.Y.S.2d 63, 68 n. 3 (2d Dept.1982) (noting that because civil rights actions usually are categorized as personal injury actions, prejudgment interest is not available under CPLR § 5001, but recognizing that where such actions are "shoehorn[ed]" into the categories of breach of contract or interference with property—as is done in cases involving civil servants—prejudgment interest may be available).

Third, even if prejudgment interest were available under state law, *Doty* cited *Conway v. Electro Switch Corp.*, 825 F.2d 593 (1st Cir.1987), with apparent approval. *Doty*, 908 F.2d at 1063. In *Conway*, as noted above, the Court of Appeals for the First Circuit addressed a case that was nearly identical with the present case and concluded that the district court did not abuse its discretion by applying the federal interest rate. *Conway*, 825 F.2d at 602.

Finally, when, as here, the issue is simply the rate at which prejudgment interest should be awarded, the district court has considerable discretion. The extent of that discretion was recognized recently by the Court of Appeals for the Second Circuit in *Chandler v. Bombardier Capital Inc.*, 44 F.3d 80 (2d Cir.1994). As the court pointed out in *Conway*, the object is to make the plaintiff whole. *Conway*, 825 F.2d at 602. In this case, the Court has found that the chosen rate of prejudgment interest is appropriate because it is designed to make the plaintiff whole.

entered (approximately seven years and eight months). The parties have proposed different methods by which to spread this amount over that period, the plaintiff arguing that it should be spread in equal monthly installments and the defendant arguing that it should be spread so that more is concentrated in later years when the plaintiff theoretically would have been earning a greater salary. The objective of fully compensating the plaintiff is best effectuated by dividing the jury's back pay award evenly over the relevant time period for purposes of calculating prejudgment interest.

The defendant's proposed computation of prejudgment interest uses, as its starting point, the plaintiff's actual salary on the date that he was terminated ($35,574.48). The defendant takes seven twelfths of this figure to arrive at the back pay owing from 1987 (i.e., the salary the plaintiff would have earned for the remainder of 1987). Then, the defendant assumes annual salary increases of 3.74% each year, and calculates prejudgment interest, compounded annually, accordingly. There are several problems with this methodology, which assumes annual pay increases from 1988 to 1994. First, it appears to be inconsistent with the amount of back pay awarded by the jury. In refusing to award the full amount of damages requested by the plaintiff and refusing to award front pay, the jury appears to have concluded that the plaintiff should have obtained a new job sometime before trial. Second, it runs contrary to the Court's own belief, based on the evidence presented at trial, that the plaintiff's duty to mitigate required, at some point before the trial, that he secure alternative employment. Because the division of back pay over time proposed by the defendant allocates too much of the damages into the later years, it deprives the plaintiff of the use of the funds that the plaintiff should have had and, therefore, undercompensates the plaintiff.

The Court adopts the basic framework proposed by the plaintiff. The back pay award will be spread, *pro rata*, over the relevant time evenly (with a smaller amount attributed to 1987 because the plaintiff worked for the defendant through April of that year). Then, it will apply the average annual United States treasury bill rate of interest as specified in 28 U.S.C. § 1961(a), which the parties have stipulated to be 6.17%. Finally, the prejudgment interest will be compounded annually. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993) (failure to apply compound rate of interest to back pay award constituted an abuse of discretion because compounding interest is the only way to make the plaintiff whole), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *see also Frank v. Relin,* 851 F.Supp. 87, 91 (W.D.N.Y.1994) (applying postjudgment treasury bill rate provided in 28 U.S.C. § 1961(a) and compounding interest annually); *Hollie,* 834 F.Supp. at 71 (applying average treasury bill rate and compounding interest annually). The compounding is appropriately done at the end of the year so that interest is not awarded on amounts that theoretically would not yet have been earned. *See Chandler v. Bombardier Capital Inc.,* 44 F.3d 80, 84 (2d Cir.1994) ("Where prejudgment interest is given, it should be assessed upon damages only as they become due."). Using these principles, the amount of the prejudgment interest on the back pay award is $72,157.24 and the judgment will include that amount.

**SO ORDERED.**