Barbara Swift **HOLLIE**, as the Personal Representative and the Administratrix of the Estate of Frances Mae Swift, Deceased, Plaintiffs,

v.

**KOREAN AIR LINES CO., LTD., Defendant.**

No. 83 Civ 7899 (PNL) (NRB).

United States District Court, S.D. New York.

Sept. 1, 1993.

As Corrected Sept. 10, 1993.

Addendum Correcting Memorandum Nov. 18, 1993.

66

F. Lee Bailey and Aaron J. Broder, New York City, Aaron J. Broder, of counsel, for plaintiffs.

Condon & Forsyth, New York City, George M. Tompkins, Jr., of counsel, for defendant.

### MEMORANDUM AND ORDER

BUCHWALD, United States Magistrate Judge.

This memorandum addresses the parties' post-trial submissions related to the availabil-

ity and computation of pre-judgment interest on the jury's award of damages.[1]

## BACKGROUND

This litigation arises out of the downing of Korean Air Lines flight KE007 over the Sea of Japan by Soviet aircraft on September 1, 1983. All the passengers and crew died as a result of the incident. Frances Mae Swift was among those aboard the airplane. This action was commenced on behalf of her estate and on behalf of her sister—the named plaintiff, Barbara Swift Hollie, her brother—Alton Swift, her aunt—Emma Bradley, and her four nieces and nephews—Charnell Letrice Swift, Mark Anthony Swift, Glenn Erich Lee, Gail Orr (referred to collectively as "plaintiffs").

The above-captioned case was consolidated with numerous others by the Judicial Panel for Multi–District Litigation before Chief Judge Aubrey E. Robinson, Jr. of the United States District Court for the District of Columbia for trial on the issue of whether the plane crash was proximately caused by the "wilful misconduct" of the defendant, Korean Air Lines ("KAL").

On August 2, 1989, the jury returned a judgment finding wilful misconduct on the part of KAL. On appeal, the Circuit Court affirmed the jury's finding of wilful misconduct. *In re Korean Air Lines Disaster,* 932 F.2d 1475 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991). Subsequently, the individual cases were remanded to their originating districts for trials on damages.

A jury trial on the issue of damages commenced on June 15, 1993. On June 25, 1993 the jury returned a verdict awarding plaintiffs $306,582 for loss of support and loss of nurture, care and guidance from the date of the accident until the date of judgment; $93,440 for loss of future support and loss of future nurture, care and guidance; and $150,000 for the decedent's conscious pain and suffering experienced prior to her death. The parties submitted post-trial briefs raising the following issues: 1) whether prejudg-

ment interest is available under the Warsaw Convention; 2) if prejudgment interest is available, whether it is appropriately awarded in this case; and 3) if appropriate, at what rate should be interest applied and whether such interest should be compounded. We will address each issue in turn.

### Discussion

■ First, defendant asserts that, since the Warsaw Convention, the governing law in this action, does not specifically provide for awards of prejudgment interest, such an award is unfounded. We reject this contention and concur with Judge Motley's ruling in *Zicherman v. Korean Air Lines,* 814 F.Supp. 605, 607–608 (S.D.N.Y.1993) (distinguishing *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842 (2d Cir.1984) and holding that plaintiff is entitled to prejudgment interest in a wrongful death action arising under the Warsaw Convention where willful misconduct has been found). *See also E.E.O.C. v. County of Erie,* 751 F.2d 79, 81 (2d Cir.1984) (noting that express statutory authority for prejudgment interest is unnecessary for the allowance of such an award.)

■ Second, defendant asserts that even if the Warsaw Convention allows for an award of prejudgment interest, such an award is discretionary under federal common law and, in the instant case, should be denied. Again, we disagree with defendant and concur with Judge Motley's ruling in *Zicherman,* 814 F.Supp. at 610–611. Generally under federal law, when entitlement to prejudgment interest has not been statutorily determined, it is left to the trial court's discretion to decide whether prejudgment interest is appropriate. *West Virginia v. United States,* 479 U.S. 305, 308–309, 107 S.Ct. 702, 705–06, 93 L.Ed.2d 639 (1987); *Wickham Contracting v. Local Union No. 3, IBEW,* 955 F.2d 831, 833 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). In exercising its discretion a trial court should consider whether an award of prejudgment interest is necessary to fully compensate the

---

1. The parties in the above-captioned case consented on November 9, 1992 to trial under 28 U.S.C. § 636(c)(1) and Fed.R.Civ.P. 73 before a United States Magistrate Judge.

plaintiff and is fair under the circumstances. *Wickham*, 955 F.2d at 834, 836.

■ Without disputing that plaintiffs require prejudgment interest to fully compensate them for the almost ten year delay in reaching a final judgment, the parties focused their arguments on whether the relative equities favor such an award. As Judge Motley's review revealed, absent extraordinary circumstances, awards of prejudgment interest are routine under federal law and have been allowed in the other cases arising from the KE007 tragedy. *Zicherman*, 814 F.Supp. at 607–610; *see also Maikovich v. Korean Air Lines Co.*, No. 83–3792 (D.D.C. July 16, 1993) (Robinson, J.); *Bickel v. Korean Air Lines Co.*, 84 CV 74076 (E.D.Mi. June 7, 1993) (Diggs–Taylor, J). In light of this Court's prior ruling that the Death on the High Seas Act ("DOHSA") should provide primary guidance in this action[2], the Second Circuit's recent reiteration that awards of prejudgment interest are proper in cases arising under DOHSA, *In re Connecticut National Bank*, 928 F.2d 39, 42 (2d Cir.1991), lends additional support for the conclusion that such an award is appropriate here. *See also Magee v. United States Lines, Inc.*, 976 F.2d 821, 822 (2d Cir.1992) (absent exceptional circumstances prejudgment interest should be awarded in admiralty cases.)

Furthermore, we find that the current case does not present the exceptional circumstances required to deny plaintiffs prejudgment interest. *Cf. Wickham*, 955 F.2d at 834–835. As is evident from the procedural history of this case, both parties made strategic decisions that resulted in a lengthy and vigorously contested litigation. Plaintiffs' strategy throughout the case has been aimed at maximizing their potential recovery. This strategy, while contributing to the delay before the final judgment, does not amount to "exceptional circumstances." *Zicherman*, 814 F.Supp. at 609 (citing *Magee*, 976 F.2d at 823). Therefore, we hold that an award of prejudgment interest is necessary to fully compensate plaintiffs and is fair under the circumstances of this case.

■ Having determined that plaintiff is entitled to prejudgment interest, we must address the issues of what method to use in calculating the award, what interest rate to apply and whether to calculate the interest on a compounded or simple basis. As an initial matter, we note that the parties entered into a pre-trial agreement to use the discounting method suggested in *Oliveri v. Delta Steamship Lines, Inc.*, 849 F.2d 742, 746 (2d Cir.1988) (recommending that the trial court perform the present value calculation and that parties agree to use an inflation free discount rate of 2%), and are in agreement that the two-step method of calculating present value and prejudgment interest should be used.[3]

After examining the jury verdict sheet, we find that the annual loss of support suffered by each plaintiff can be distilled from the jury's answers to the Special Verdict Questions. Apparently, the jury found that Frances Swift would have contributed $1,961 per year in support to each plaintiff. Defendant's August 13, 1993 submission to the Court, Ex. 2, endeavors to break down the jury's verdict by year and by plaintiff. Aside from the modification of Gail Orr's and Mark Swift's lost annual support, as set out in the

2. *See Park v. Korean Air Lines Co.*, 1992 WL 331092 (S.D.N.Y.1992).

3. The two-step method entails discounting the award of losses which will accrue subsequent to the trial back to the date of trial and applying prejudgment interest to losses that have accrued prior to trial from the dates they would have been received until the date of trial. *See Connecticut Nt'l Bk.*, 928 F.2d at 42. The one-step method, on the other hand, entails discounting the entire damage award, including both past and future losses, back to the date that the loss occurred, here the date of the crash. To this amount, the applicable rate of prejudgment interest is applied until the date of trial. *See id; see also Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538 n. 22, 103 S.Ct. 2541, 2551 n. 22, 76 L.Ed.2d 768 (1983); *Taliercio v. Compania Empressa Lineas Argentina*, 761 F.2d 126, 129 (2d Cir.1985). Although the Second Circuit has expressed a clear preference for the one-step method, which more accurately accounts for the inflation related increases to future income, *Connecticut Nt'l Bk.*, 928 F.2d at 42, plaintiffs have espoused use of the two-step method. Since the two-step method is an acceptable alternative, the Court will abide by the parties' views, which were specifically solicited by our letter of August 4, 1993.

margin,[4] our analysis of the jury's verdict is consistent with defendant's August 13 submission. Therefore, that submission, as modified herein, may be used as a point of reference, which will permit the precise calculation of prejudgment interest on past lost support. Defendant's method of averaging the annual pretrial loss of nurture, care, and guidance is acceptable since the jury's award is not readily divisible by year.

Consistent with the preceding discussion, prejudgment interest should be applied to the annual awards of past support and past nurture, care and guidance from the year the awards would have been received until the date of trial. Furthermore, the award for pre-death pain and suffering should be treated as if incurred on the date of the accident. *See, McCrann v. U.S. Lines, Inc.,* 803 F.2d 771, 773 (2d Cir.1986). As the parties are in substantial agreement about the discounting of future losses, it is unnecessary to address that matter further.

Remaining, obviously, is the issue of what rate of prejudgment interest applies. This issue is complicated by the surprising lack of legislative guidance and the resulting inconsistency in the prejudgment interest rates used by the courts.[5] *See, e.g., Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 311 (2d Cir.1987) (affirming application of 52–week T-bill); *McCrann,* 803 F.2d at 773 (affirming application of six-month T-bill rate); *E.E.O.C. v. County of Erie,* 751 F.2d at 82 (affirming application of adjusted prime rate); *Malarkey v. Texaco, Inc.,* 794 F.Supp. 1237, 1243 (S.D.N.Y.1992) (applying New York statutory rate in Title VII action), *aff'd,* 983 F.2d 1204 (2d Cir.1993); *Danna v. New York Tel. Co.,* 755 F.Supp. 615, 617 (S.D.N.Y. 1991) (applied annual federal short-term rates used by IRS in determining underpayment of taxes.)

Reflecting the inconsistency in the case law, the parties have submitted a vast array of rates for the Court's consideration,[6] several in response to the Court's direction to relate these rates to the Second Circuit's recent discussion in *Connecticut Nt'l Bk.,* 928 F.2d at 42, 47, concerning the framework for determining prejudgment interest. In finding that the trial court had abused its discretion in applying a constant 12% prejudgment interest rate, the Circuit Court remanded the case for a recalculation of damages and indicated that the interest rate should be chosen after considering two factors: 1) the interest rate a plaintiff could likely receive on relatively risk-free investments; and 2) of particular importance, the inflation that occurred between the date of the accident and the date of trial. *Id.* at 47.

■ Applying this guidance, we consider which of the proposed rates incorporates the factors enumerated in *Connecticut Nt'l Bk.* We examine, first, the rate of return on investments that plaintiffs would likely have received had they obtained their judgment at an earlier date. This factor encompasses the well-settled principle discussed above that an award of prejudgment interest is often necessary to adequately compensate a plaintiff for the loss incurred. *Wickham,* 955 F.2d at

---

4. Defendant aggregates the total past pecuniary loss for each plaintiff and averages the annual payments over the ten year pretrial period. While this method is accurate for five of the plaintiffs, it is not consistent with a jury award of $1,961 in annual support for Mark Swift and Gail Orr. On the basis of a constant annual payment, support would have ceased for Gail Orr after Pretrial Year 5 and for Mark Swift after Pretrial Year 3, approximately the time each turned 21. This analysis of past annual support payments corresponds to the jury's finding in Special Verdict Question 10 that the awards of nurture, care and guidance for the decedent's nieces and nephews would cease when each turned 21.

5. In contrast, there is clear legislative guidance concerning the rate of postjudgment interest, which has been set by statute and equals the rate on the 52–week United States Treasury Bill ("T-bill") for the last auction settled immediately prior to the date of judgment. 28 U.S.C. § 1961 (1976), as amended by Pub.L. No. 97–164, § 302(a), 96 Stat. 25 (1981)

6. Plaintiff suggests that the Court apply, alternatively, a rate based on the ten year Treasury Bond yield in September, 1983 (11.1%), the average prime rate from 1983 to 1993 (9.06%), or the Michigan statutory rate (12%). KAL suggests that the Court apply the average 52–week United States Treasury Bill rate from 1983 to 1993 (approximately 7.2%) or a straight rate equal to the average rate of inflation plus the 2% real interest rate (5.8%).

833, 835. Among the rates suggested by the parties and used by other courts, the average annual 52–week T-bill rate appears to adequately compensate the plaintiffs for the loss they have incurred by having to wait almost ten years for the resolution of their case.

Use of this rate to compensate plaintiffs for the delay in receiving a judgment has been sanctioned by the Second Circuit, *see, e.g., Ingersoll Mill. Mach. Co.,* 829 F.2d at 311 (reasoning that, since prejudgment interest rate should be measured by interest available on short-term, risk-free obligations, a trial court's use of the interest rate on the 52–week T-bill—a short-term, risk-free obligation—was not an abuse of discretion), and is consistent with the legislative history of 28 U.S.C. § 1961, which provides for, among other things, the calculation of the post judgment interest rate applicable in civil cases. In a floor amendment changing the applicable post judgment interest rate from the average prime rate to the 52–week T-bill, Senator Grassley, the sponsor of the amendment, commented that the 52–week T-bill rate "more accurately reflect[s] prevailing money market conditions" than the prime rate.[7] 127 Cong.Rec. 29865 (daily ed. Dec. 8,

1981) (statement of Sen. Grassley). Although by the same floor amendment the Senate deleted the portion of the proposed § 1961 that addressed prejudgment interest, the rationale for post judgment interest—compensation—is substantially the same as the rationale behind prejudgment interest. *See e.g. Harbor Transp. v. Gowanus Towing Co.,* 618 F.Supp. 954, 962 (S.D.N.Y.1985); *accord Western Pac. Fisheries, Inc. v. S.S. President Grant,* 730 F.2d 1280, 1288–89 (9th Cir.1984) (holding that the post judgment interest rate is applicable to prejudgment interest unless there is substantial evidence that such rate is inequitable.)[8]

In addition to the judicial and legislative support for the use of the 52–week T-bill rate, the selection of this rate meets the requirements of a relatively secure investment and is also a realistic investment for these plaintiffs to have made. In contrast, plaintiffs' proposed rate based on the ten-year Treasury Bond presupposes that plaintiffs would have relinquished use of their award for ten years in order to capture a higher yield. This supposition bears no relation to the economic realities of plaintiffs' circumstances.[9]

---

**7.** In its original form, the provisions on post judgment interest in the 1982 Amendment to 28 U.S.C. § 1961 (entitled the Federal Courts Improvement Act of 1982) incorporated section 6621 of the Internal Revenue Code of 1954, which at the time referred to the average prime rate as the rate to be applied in determining interest on amounts owed for the underpayment or overpayment of taxes. However, this provision of the Internal Revenue Code was amended by the Tax Reform Act of 1986 to set an interest rate that was tied to three-year T-bills. Consequently, it appears that the average prime rate has been abandoned by Congress for the purposes of calculating interest on tax-related and other civil judgments.

**8.** A number of courts have looked to § 1961 and its legislative history to determine the appropriate rate to be applied to prejudgment interest. However, the complex legislative history of § 1961 and the change in the base rate that the IRS uses to calculate over- and underpayment interest has led to an inconsistency in the rate that has been used. For example, in *Zicherman* the court looked to the Senate Report discussing the proposed § 1961 which did not reflect the subsequent floor amendment. 814 F.Supp. at 611. *See also E.E.O.C. v. County of Erie,* 751 F.2d at 82 (applying the adjusted prime rate

because it was, at the time, the base rate used by the IRS). Nevertheless, by looking to Congress' considered choice of the post judgment interest rate for guidance, these cases support the analysis that we employ here.

**9.** Defendant argues that the framework set forth in *Connecticut Nt'l Bk.* supports a prejudgment rate equal to the average inflation rate, as measured by the change in the Consumer Price Index, plus the 2% historical real interest rate. However, this rate does not appear to correspond to any market interest rate. By pointing out that the resulting rate approximates the average return on municipal bonds from the period from 1983 to 1993, the defendant underscores the illogic of its position. Municipal bonds are tax-free investments that are appropriate for only particular investors, and there was no evidence adduced at trial to indicate that plaintiffs would have been likely to have made use of tax-advantaged investments. As a result, the defendant's rate ignores the first factor in the *Connecticut Nt'l Bk.* framework—the interest the plaintiff could likely have received on a relatively risk-free investment. In addition, nowhere in the *Connecticut Nt'l Bk.* opinion does the Circuit advocate a judicially created prejudgment interest factor that does not track a commonly available interest rate.

We must next examine whether the 52–week T-bill accounts for the inflation factor discussed in *Connecticut Nt'l Bk.* In this regard it should be recalled that the parties agreed to use the inflation free discount rate, *see* Letter from Mosley to Tompkins, Jr. dated June 14, 1993, and the projections of plaintiffs' economist at trial, Dr. Seymour Barcun, did not account for the effect inflation would have had on the decedent's wages after her death, *see* Pl.'s Ex. 76. Thus, it is appropriate at the post trial stage for the Court to reintroduce inflation into the damage calculus in order to reflect the inflation-related increases in wages that the decedent would have received between the time of the accident and the time of trial. *See id.* at 45. In addition, when using the two-step method and in the absence of known wages paid to comparable employees during the interval from date of loss to date of trial, a court may assume that inflation would have increased past payments by the inflation component of whatever interest rate the recipient can obtain on the invested funds. *Cf. id.* at 47.

As discussed above, the yield on a 52–week T-bill is an appropriate approximation of the interest rate plaintiffs could have earned on their funds. In addition, as a highly liquid, short-term, and risk-free investment, the 52–week T-bill embodies, in part, the financial communities estimate of future inflation and, over time, has moved closely with the actual inflation rate. *See, generally,* Dennis E. Logue, *Handbook of Modern Finance* Ch. 13, 7–11 (1984). Furthermore the United States Treasury sells 52–week T-bills periodically throughout the year, 127 Cong.Rec. 29865, and the rates are determined on a monthly basis. Using the average of the monthly rates for each year, or portion of a year, from 1983 to 1993 will yield annual rates that reflect the financial market's sensitivity to the widely fluctuating rate of inflation that existed during that time period. *Cf. Golden State Transit v. Los Angeles,* 773 F.Supp. 204, 219 (C.D.Cal.1991) (use of interest rate on 52–week T-bill, adjusted monthly, in case

that lasted almost ten years before final judgment was entered adequately compensates plaintiff and avoids windfall that would result from the use of the ten year Treasury Bill rate available at the time damages accrued.) Therefore, for the reasons discussed above, we conclude that the average annual 52–week T-bill rate incorporates the two factors set out in *Connecticut Nt'l Bk.* and, of the proposed rates, is the most appropriate one to be applied to an award of prejudgment interest.

Lastly, in order to adequately compensate the plaintiffs for their deprivation of the use of the·award for the almost 10 year duration of this litigation, prejudgment interest should be compounded annually. *See* S.Rep. No. 275, 97th Cong., 2nd Sess., *reprinted in* 1982 U.S.C.C.A.N. 11, 22, 40; *see also Connecticut Nt'l Bk.,* 928 F.2d at 44 (discussing with approval trial court's use of compound interest in action arising under DOHSA.)

To summarize, the parties are ordered to prepare a judgment form awarding prejudgment interest according to the two-step method of calculating present value—the award for future losses should be discounted back to the date of the judgment at the agreed upon discount rate of 2% and prejudgment interest, compounded annually, should be applied to past losses from the dates they would have been received until the date of judgment.[10] Furthermore, prejudgment interest should be applied at a rate equal to the average annual rate of interest on the 52–week T-bill.

**IT IS SO ORDERED.**

### CORRECTING ADDENDUM

BUCHWALD, United States Magistrate Judge.

The last sentence on page 6 ("Defendant's method of averaging the annual pretrial loss of nurture, care, and guidance is acceptable since the jury's award is not readily divisible by year.") is modified since

---

**10.** We note here that plaintiffs' current economist, John Henning, incorrectly performed the two-step method by discounting past losses back to the date of the accident and adding prejudgment interest to the discounted total from the date of the accident to the date of trial. Prejudgment interest is to be applied according to the formulation set forth in *Connecticut Nt'l Bk.,* 928 F.2d at 42, described above.

upon further examination all the awards in this category are evenly divisible by the number of years the jury awarded such damages to individual plaintiffs. Averaging over the entire pretrial period is only appropriate if there is an award for loss of nurture, care, and guidance for every pretrial year. Moreover, the analytic method employed in footnote 4 may be utilized to calculate the allocation by year of the nurture, care, and guidance awards for the nieces and nephews and the interest applicable thereto. It should be noted that the judgment signed on October 27, 1993 was prepared consistently with this correcting addendum.