**UNITED STATES of America and Robert B. Reich, Secretary of the United States Department of Labor, Plaintiffs,**

v.

**MASON TENDERS DISTRICT COUNCIL OF GREATER NEW YORK, et al., Defendants.**

**No. 94 Civ. 6487 (RWS).**

United States District Court,
S.D. New York.

Dec. 12, 1995.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Allan N. Taffet, Manvin S. Mayell, Assistant U.S. Attorneys, of counsel), for the United States of America.

Andrew M. Lawler, P.C., New York City (Andrew M. Lawler, Maurice M. McDermott, of counsel), for Defendant Joseph Fater.

## OPINION

SWEET, District Judge.

This Court, in its opinion and order of May 15, 1995, (the "May 15 Opinion") granted partial summary judgment in favor of Plaintiffs, the United States of America and Robert B. Reich, Secretary of the United States Department of Labor (collectively, the "Government"), against Defendants Joseph Fater ("Fater") and James Lupo ("Lupo") (collectively, "Defendants"), for ERISA violations in connection with the Mason Tenders Pension and Welfare Funds' (the "Funds") purchase of certain real property in New York (the "West 18th Street Property") and Florida (the "Florida Property") (collectively, the "Properties"). *United States v. Mason Tenders Dist. Council,* 909 F.Supp. 882

(S.D.N.Y.1995). Defendants' motion for reconsideration of the Court's decision and order was denied for reasons set forth in the Opinion of August 18, 1995 (the "August 18 Opinion"). *United States v. Mason Tenders Dist. Council*, 909 F.Supp. at 889. Familiarity with both opinions is assumed.

The August 18 Opinion deferred entry of final judgment against Fater and Lupo until the parties had submitted evidence on the issue of damages. On September 11, 1995, the Government submitted a letter presenting such evidence, and Fater responded on September 18, 1995. The matter was deemed fully submitted and oral argument was heard on September 26, 1995. Lupo neither submitted papers nor appeared for oral argument.

### Discussion

■ ERISA establishes that a trustee who breaches a fiduciary duty to an employee benefit plan "shall be personally liable to make good to such plan any losses to the plan resulting from such breach." 29 U.S.C. § 1109(a). This has been held to be a restitutionary measure of damages: under this standard, plan participants must be placed in the position they would have occupied absent the breach. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985); *Reich v. Valley Nat'l Bank of Ariz.*, 837 F.Supp. 1259, 1285 (S.D.N.Y.1993) (Motley, J.). As this Court noted in *Reich*, where the breach has resulted in an excessive price being paid for an investment, the fiduciary is "liable for the difference between the price paid and the price that should have been paid." *Reich*, 837 F.Supp. at 1289. The May 15 Opinion held Defendants liable for the excessive price paid by the Funds for the Properties.

### I. The Source of Defendants' Liability

According to Fater, the May 15 Opinion and the August 18 Opinion held that his breach of fiduciary duty had arisen only from his failure to mitigate losses to the Funds after the Properties had been purchased, that because he was not present at the meetings at which the decisions to purchase were made, his breach of fiduciary duty had not arisen from his failure to prevent the purchase, and therefore that he was liable only for losses suffered after the purchase.

However, the August 18 Opinion rejected Fater's contention that the May 15 Opinion had left open the source of his and Lupo's liability. The May 15 Opinion noted that "the lack of any independent investigation of the purchases of these properties failed the careful inquiry required of a trustee [under ERISA]." 1995 WL 293962 at 5, 1995 U.S.Dist. LEXIS 6470 at *7. In moving for reconsideration, Fater contended that the May 15 Opinion had premised the breach of duty on a presumption that Fater had actual, advance knowledge of the contemplated purchases. The August 18 Opinion rejected that reading, reiterating that:

> Defendants' liability does not depend on a definitive finding that they affirmatively acted to approve the real estate purchases but, rather, is based on the conclusion that, through various of their actions and omissions, they failed to discharge their fiduciary obligations under ERISA "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character."

1995 WL 495506, at 2, 1995 U.S.Dist. LEXIS 11971, at *3 (*citing* 29 U.S.C. § 1104(a)(1)(B) (other citations omitted). Fater's liability is based on his failure to prevent the purchase of the Properties, regardless of the extent of his knowledge, and the judgment will be calculated on that basis.

### II. The Florida Property

■ Only Fater, not Lupo, was held in the May 15 Opinion to be liable for breach of fiduciary duty with regard to the Florida Property. The Welfare Fund paid $1,450,000 for that Property on November 7, 1987. On June 2 of that same year, Eugene Klein, a certified appraiser with Professional Appraisals, Inc., assessed the Property as worth between $750,000 and $850,000 (the "Klein Appraisal"). Taking the higher of the two values to be the proper measure, in Fater's favor and as stipulated by the Government,

the damages to the Fund amount to the difference between $1,450,000 and $850,000: that is, $600,000.

According to Fater, the Florida Property had a higher intrinsic value according to a "value-in-use" theory of property valuation, based upon Klein's statement that had the property been purchased and put to an ancillary use by St. Francis Hospital, it would have "attain[ed] a higher price than that based strictly on market value." However, even supposing that any value-in-use could have risen to $1,450,000, that value could not have been reaped by the Welfare Fund in its purchase and use of the property. Indeed, there is no reason to suppose that St. Francis Hospital, had it purchased the property, would have paid anything more than the market price.

The difference between the June 2 market value as assessed and the November 7 purchase price is an appropriate measure of the damages suffered by the Fund in its purchase of the Florida property as a result of Fater's breach of fiduciary duty. No evidence offered shows a significant change in value in the five months between valuation and purchase. Damages before interest thus amount to $600,000.

### III. *The West 18th Street Property*

■ On November 27, 1990, the Pension Fund paid $24 million for the West 18th Street Property. Three appraisals were conducted before the Fund purchased the Property, all within several days of one another. The first of these (the "DiFranco Appraisal") was performed by DiFranco Realty on December 29, 1989, approximately eleven months before the Fund purchased the West 18th Street Property. DiFranco appraised the Property at $15,950,000. The second of the pre-purchase appraisals (the "Mistretta Appraisal") was performed by Diane Mistretta, who issued a report on January 2, 1990, assessing the property's worth at $15,850,000. The third (the "Wasserman Appraisal"), for $8,300,000, was conducted by Wasserman Realty Service, which delivered its report on January 4, 1990.

On February 1, 1990, ten months before the Fund purchased the West 18th Street Property, the Fund lent $15,850,000 to Ronald Miceli ("Miceli") for him to purchase the Property (the "Miceli Purchase"), an amount apparently based on the Mistretta appraisal. Miceli purchased the property on that same day for less than half that amount: $7,465,000 (the "Miceli Purchase Price").

Finally, in September 1991, ten months after the Pension Fund purchased the Property, Cushman & Wakefield conducted a comprehensive analysis at the behest of the Pension Fund (the "Cushman & Wakefield Appraisal"). Despite the fact that the Fund had spent an additional $5.62 million for renovations in the intervening months, the appraisal was for $5 million.

The Miceli Purchase Price is the most reliable measure of the reasonable value of the West 18th Street Property on the date it was purchased by the Pension Fund. The Government concedes that Miceli's February 1, 1990, purchase was "an apparently arms-length transaction". The Miceli Purchase Price thus presents the most direct and practical evidence of the Property's market value at the time of its purchase by the Pension Fund.

The Wasserman appraisal, coming one month prior to Miceli's purchase, is consonant with Miceli's Purchase Price and tends to buttress the latter's validity. Between the Miceli Purchase Price and the Wasserman Appraisal, the actual purchase is more likely to reflect that actual market value. Appraisals represent a best estimate or approximation of value, whereas an actual purchase, assuming the purchase is made after arms-length negotiations and in a reasonably competitive market, shows fair market price.

For the same reason, the Cushman & Wakefield appraisal, though credible and closer in time to the Pension Fund purchase, has less probative value than the Miceli purchase price.

The DiFranco and Mistretta Appraisals are disregarded, as they were conducted only a month before the Miceli Purchase yet amount to double the Miceli Purchase Price.

The loss sustained by the Pension Fund in purchasing the West 18th Street Property is thus the difference between the Miceli Pur-

chase Price, $7,465,000, and the Fund's November 27, 1990, purchase price, $24,000,000: that is, $16,535,000.

## IV. *Prejudgment Interest*

The award of prejudgment interest in cases against fiduciaries is a matter of judicial discretion, the purpose being not to penalize the trustee but to make plan participants whole. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 286 (2d Cir. 1992). An award of prejudgment interest is appropriate here. As noted above, ERISA provides that a fiduciary shall be personally liable for "any losses to the plan resulting from [his] breach," 29 U.S.C. § 1109(a). Moreover, our Court of Appeals has held that to satisfy this standard, plan participants must be restored to the position they would have occupied absent the breach. *Donovan,* 754 F.2d at 1056. The rate of interest, then, should make up the difference between "what the plan earned during the time in question and what it would have earned had the money lost due to the breach been available." *Diduck,* 974 F.2d at 286.

To this end, the courts have often employed the rate used by the Internal Revenue Service ("IRS"), set forth at 26 U.S.C. § 6621. That is the rate the Government advocates here. As this Court has noted in the past, the IRS rate provides an "objective measure of the value of money." *Russo v. Unger,* 845 F.Supp. 124, 127 (S.D.N.Y.1994) (Haight, J.) (citation and internal quotation marks omitted).

It is true that the IRS rate was at one time held to be excessive in certain cases. The Court of Appeals in *Diduck* reversed the district court's award of prejudgment interest computed at the IRS rate in a case against a fiduciary. However, as noted in *Russo,* 845 F.Supp. at 127, the *Diduck* court evaluated an application of § 6621 when that statute tied the IRS rate to the prime rate, noting that "[p]rime is not an appropriate measure where a plan typically does not earn that sort of a return on its investments." *Diduck,* 974 F.2d at 286. The IRS rate is now tied to the short-term Government lending rate, not the prime rate, and this rate, as it would apply to the period of the Mason Tenders Funds' damage, is squarely within

the range of what may fairly be considered a normal return on investment.

It is true that the Government has offered no evidence of the actual return earned on the Funds' investments during the period of their injury nor any suggestion of what might have been a plausible investment strategy for the Funds. However, Fater does not contest the reasonableness of the IRS rate, nor does he suggest that the rate fails to correspond to any actual rate of return earned by the funds. *Diduck,* 974 F.2d at 286 (*citing Donovan,* 754 F.2d at 1056). Inasmuch as the IRS § 6621 rate cannot be said to be excessive on its face, but is rather firmly within the range of reasonable return on investment, and given that the Court of Appeals has held that where plaintiffs offer several plausible investment strategies and corresponding rates of return, defendants bear the burden of showing that a plan would not have earned the highest of these rates, the IRS rate is an appropriate means of approximating the return that the Funds would have earned. It is, therefore, an appropriate rate for the calculation of prejudgment interest.

Finally, it must be determined whether compound or simple interest should be used to calculate the prejudgment interest. Here again, guidance is provided by ERISA's mandate that the damaged party be placed in the situation in which it would have been absent the fiduciary breach. Compound interest is, therefore, appropriate, for, as the Government notes and Fater does not contest, it is most likely that the Funds would have invested—at compound interest—the amounts that were overpaid for the properties. In *Russo,* the Honorable Charles S. Haight, noting that the courts have not consistently chosen between simple and compound interest, determined that the latter was merited by two factors: evidence of self-dealing and a showing that there was a duty to reinvest at compound interest. *Russo,* 845 F.Supp. at 128. Here Defendants' conduct involved gross delinquencies, rather than honest mistake or bad judgment, and Fater and Lupo, as trustees, did have a duty to invest in a manner that would earn compound interest. In light of these facts and of Defendants'

failure to oppose the Government's request for compound interest, interest will be compounded.

### Conclusion

For the reasons set forth above. Damages are set at $600,000 for the Florida Property and $16,535,000 for the West 18th Street Property, with prejudgment interest awarded at the IRS § 6621 rate and compounded as set forth in the Declaration of Patricia Ponders annexed to the Government's letter of September 11, 1995.

Final judgment on these amounts will be entered against Defendants, with Fater being liable for the full amount of damages plus interest on the Florida Property and Fater and Lupo being jointly and severally liable for the full amount of damages plus interest on the New York Property.

Plaintiffs are directed to settle judgment upon seven days' notice within thirty days from the date of this Order.

It is so ordered.