Jack **WEBB, Eugene Sterner, Fred Ryan, Alex Koulikas, Frances Kurau and William Collier, as individuals, and on behalf of a class of individuals similarly situated, Plaintiffs,**

v.

**GAF CORPORATION; GAF Employee Benefit Program for International Association of Machinists and Aerospace Workers, Johnson City Lodge # 1807; and GAF Employee Benefit Program for International Chemical Workers, Local # 306, Defendants.**

No. 85–CV–777.

United States District Court,
N.D. New York.

Dec. 3, 1996.

Hancock & Estabrook (David E. Peebles, of counsel), Syracuse, NY, for Plaintiffs Jack Webb, Eugene Sterner, Fred Ryan and "IAM" Class.

Carpenter, Bennett & Morrissey (Patrick Brady, of counsel), Newark, NJ, for Defendants.

## *MEMORANDUM–DECISION AND ORDER*

MUNSON, Senior District Judge.

The court now considers the Report and Recommendation of Magistrate Judge David R. Homer in regard to the calculation of damages to the plaintiff class in this case about retiree medical benefits. Defendants have lodged objections to that portion of the report concerning the recommended award of prejudgment interest. Doc. 257. Plain-tiffs have not responded to the objections but have requested clarification of the injunction entered in this court's prior opinion deciding the post-trial motions. Doc. 263.[1] Both parties request an order allowing applications for attorneys' fees to be postponed until the Second Circuit decides any appeal of this case. The following constitutes the court's disposition of these issues.

■ As a preliminary matter the court accepts the following recommendations and findings which do not appear to be controverted: (1) the loss to the IAM plaintiff class totals $278,454.24,[2] allocated among the class-members as specified in plaintiffs' exhibit 41, Ex. B att'd to Brady Aff., Doc. 258; and (2) if prejudgment interest is awarded, the interest rates should be the same as those used to calculate postjudgment interest pursuant to 28 U.S.C. § 1961(a), although the mechanics of applying those rates is in contention. *See* Rep.–Rec., Doc. 255, at 2–3. To accept the recommendations of a federal magistrate judge to which there are no objections, "a district court need only satisfy itself that there is no clear error on the face of the record." *McAllister Bros., Inc. v. Ocean Marine Indem. Co.*, 742 F.Supp. 70, 74 (S.D.N.Y.1989). As no manifest error presents itself, the court adopts in full the magistrate's recommendations with respect to these uncontested issues.

A district judge is tasked to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). In the instant matter, defendant objects to (1) the award of any prejudgment interest, (2) the methodology the magistrate recommends for determining how to apply the interest rates to the damage increments, and (3) the decision to use compound rather than simple interest. Defs.' Mem. Law, Doc. 257. The court's plenary review of these points commences below.

---

1. Familiarity is assumed with that memorandum-decision and order, number 238 on the docket, available at 1996 WL 31317, and to be reported at 936 F.Supp. 1109 (N.D.N.Y.1996).

2. This figure apparently omits damages to another GAF retiree, Daniel Orband, who presumably must be accounted for. *See* Pl.'s Letter–Brief, Doc. 264, at 8 n. 3.

## I. DISCUSSION

### A. Prejudgment Interest

Defendant disputes the propriety of the award of prejudgment interest. Initially, the court notes that the IAM plaintiff class recovered on causes of action arising under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), and section 301 of the Labor Management Relations Act of 1947 (LMRA or Taft–Hartley Act), 29 U.S.C. § 185.

■ The Second Circuit Court of Appeals, in considering a district court's grant of prejudgment interest in a case under section 303(b) of the Taft–Hartley Act, held that such an award was within the sound discretion of the trial judge. *Wickham Contracting v. Local Union No. 3, Int'l Bhd. Of Elec. Workers,* 955 F.2d 831 (2d Cir.), cert. denied, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992). That discretion is guided by the following considerations:

> [T]he award should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Id.* at 833–34 (citations omitted).

Those "other general principles" include whether the legislative intent was to preclude prejudgment interest, whether such a grant would overcompensate the plaintiff, and whether the defendant acted innocently. *Id.* at 834. If the statute in question already provides for full compensation or punitive damages, prejudgment interest is likely improper, and the speculative nature of damages until the date of judgment also might render such an award unfair. *Id.* at 835. Ultimately, the purpose of prejudgment interest is to fully compensate the plaintiff, by taking into account the time-value of money. *See Zicherman v. Korean Air Lines Co.,* 814 F.Supp. 605, 608 (S.D.N.Y.1993), aff'd in part, rev'd in part on other grounds, 43 F.3d 18 (2d Cir.1994), aff'd in part, rev'd in part on other grounds, —— U.S. ——, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996).

Applying these standards, the *Wickham* panel affirmed the award. Although that case was an appeal of a section 303(b) suit, the *Wickham* analysis is equally applicable to actions pursuant to section 301 of the LMRA. *See Id.* at 838. Subsequent cases also have utilized the *Wickham* regime in ERISA suits. *See, e.g., Mendez v. Teachers Ins. and Annuity Ass'n,* 982 F.2d 783, 790 (2d Cir.1992); *Connecticut Gen. Life Ins. Co. v. Cole,* 821 F.Supp. 193, 202 (S.D.N.Y.1993).

■ In the present case, the magistrate determined that in order to compensate the plaintiff class fully, prejudgment interest on the damages should be allowed. This court concurs. Plaintiffs were charged excess premiums from October 1, 1984 until the date defendant began to comply with the injunction, April 1, 1995, a period exceeding ten years. The value of the overcharged monies has depreciated over a period as long as twelve years. *Cf. Zicherman,* 814 F.Supp. at 608 (nine years; prejudgment interest allowed). Unless the IAM classmembers recover the cost of GAF's use of their money in this interim, they will not be compensated fully for their loss.

The relative equities of this matter, the second consideration in *Wickham,* also weigh in favor for the award. The record in this case reveals that some of the plaintiffs elected early retirement to the detriment of their pension receipts in order to secure the benefit of GAF's medical insurance program after the sale of the company's reprographics and graphic arts divisions in the Binghamton area. *See, e.g.,* Test. of Frances L. Kurau, J.A. II, Doc. 260, at A0844–46. Having decided to forgo some economic benefits in order to guarantee that they would continue to be covered by advantageous medical coverage, it would be unfortunate not to compensate the IAM classmembers for the lost use of money they had to spend to continue the medical benefits for which they sacrificed part of their pensions.

■ Turning to the third factor, that is, whether the statute in question is remedial, it seems evident that section 301 of the LMRA

is. *See* 93 Cong.Rec. 3656 (1947) ("[Section 301] contemplates not only the ordinary lawsuits for damages but also such other remedial proceedings, both legal and equitable, as might be appropriate in the circumstances. . . .") (statement of Rep. Barden). The decision in *IAM v. United Aircraft* affirmed that "[i]n suits for breaches of labor agreements . . . a vital ingredient in the determination whether to award prejudgment interest is a desire to make whole the party injured by the breach." 534 F.2d 422, 447 (2d Cir.1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). And as the Ninth Circuit observed, "[o]ther courts have similarly allowed tort-like, 'make-whole' remedies" in breach of CBA suits under the Taft–Hartley–Act. *Rozay's Transfer v. Local Freight Drivers, Local 208, Int'l Bhd. Teamsters,* 850 F.2d 1321, 1335 (9th Cir. 1988), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). The remedial scheme of ERISA also suggests prejudgment interest is appropriate if required to make the prevailing party whole. *See Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.) (holding that "it is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest"), *cert. denied sub nom. Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Scalamandre v. Oxford Health Plans,* 823 F.Supp. 1050, 1063 (E.D.N.Y.1993) (section 502(a)(1)(B) claim). *But see id.* (concluding that simple interest should be used).

■ As for the "other general principles" referred to in *Wickham*'s fourth factor, 955 F.2d at 834, GAF interposes the objection to an award of prejudgment interest that it acted in good faith in disputing the meaning of the collective bargaining agreements at issue. Indeed, Magistrate Judge Homer found that there was insufficient evidence available "to assess whether GAF acted in good faith or was unjustly enriched." Rep.–Rec., Doc. 255, at 5. Delay alone however can be sufficient to justify an award of prejudgment interest. *Algie v. RCA Global Comms., Inc.,* 891 F.Supp. 875, 899 (S.D.N.Y. 1994), *aff'd,* 60 F.3d 956 (2d Cir.1995). Even assuming GAF's good faith, prejudgment interest is compensatory, not punitive, in nature and "wrongdoing by a defendant is not a prerequisite to an award." *Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.,* 534 F.2d 422, 447 (2d Cir. 1975) (reversing district court's refusal to make award), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976). Therefore, defendant's good faith does not shift the balance of equities away from a grant of prejudgment interest in this matter.

The Second Circuit in *Wickham* also observed that "[t]he certainty of the damages due the plaintiff has been another factor in resolving prejudgment interest issues." 955 F.2d at 835. This consideration is the progeny of the old common law rule that forbade prejudgment interest when the damages were unliquidated or unascertainable up until the time of judgment. *See* 5 Corbin On Contracts § 1048 (1964). That doctrine however has no application in this case because the difference between the premiums provided for in the GAF–IAM collective bargaining agreements and the higher premiums actually charged to the plaintiff classmembers from 1984 onwards were obvious to all involved. *Cf. Wickham,* 955 F.2d at 840 (damages "not so conjectural that an award of prejudgment interest was an abuse of discretion under the circumstances"); *Beelman Truck Co. v. Chauffeurs, Teamsters, Warehousemen and Helpers, Local Union No. 525,* 33 F.3d 886, 892 (7th Cir.1994).

The matter of possible overcompensation, 955 F.2d at 834, is treated in the discussion on interest methodology and whether to compound it. As for *Wickham*'s admonition against prejudgment interest when the statute provides for exemplary damages or other excess recovery, neither the LMRA nor the relevant sections of ERISA provide for such relief. *E.g., Wickham,* 955 F.2d at 839 (LMRA "does not fix liquidated damages, and does not double or treble damages").

Having applied the *Wickham* factors to the circumstances of this case, the court concludes that an award of prejudgment interest is warranted. The court moves on to the question of how to calculate the interest due.

## B. Method of Calculating Interest

The parties agree that the applicable interest rate should be the same as that prescribed for postjudgment interest in 28 U.S.C. § 1961(a).[3] Magistrate Judge Homer adopted the IAM class' proposed method for applying these rates. The IAM class described this method in their damages hearing brief:

> The methodology now proposed by the IAM Plaintiff Class treats each month of excess payment as a discrete component of damages. That component is quantified for each classmember by subtracting from the sum paid to GAF for coverage ... the amount which by contract should have been paid.... To that figure an interest rate determined pursuant to 28 U.S.C. § 1961(a) based on the fifty-two week Treasury bill auction settled immediately prior to the particular month has been applied, brought forward to August 31, 1996, and compounded in accordance with 28 U.S.C. § 1961(b).

Doc. 251, at 13–14.

For example, the 52–week treasury bill rate from the September 27, 1984 auction was 11.36 percent. In October 1984, IAM classmember Ralph Allen was charged $15.25 for medical coverage which should have cost him $3.00, a difference of $12.25. The IAM methodology would calculate interest on this overcharge at 11.36 percent, compounded annually, until entry of judgment. Assuming entry of final judgment on September 30, 1996—an even twelve years of interest accrual, for simplicity's sake—Mr. Allen would earn $32.30 on the $12.25 overcharge, for total damages for that month of $44.55.[4] Interest on Mr. Allen's damages the following October would accrue for only eleven years at the rate established at the September 26, 1985 treasury bill auction, 7.87 percent. Interest

on that $12.25 overcharge would be about $15.94, for total damages of $28.19.

GAF objects to this method of calculation. Defendant recommends instead that the average or arithmetic mean of all treasury bill rates from the first overcharge to the present be applied to the increments of damage. Including the October 10, 1996 equivalent coupon issue yield of 5.64 percent, the average rate over the period has been 6.42 percent. Compounding Mr. Allen's October 1984 damages at this rate over twelve years and one month yields $13.73 in interest on the $12.25 overcharge. Of course, defendant also requests that simple, rather than compound interest be used, an issue taken up later. Simple interest on Ralph Allen's October 1984 overcharge at 6.42 percent would yield only $9.50 in interest.[5]

GAF maintains that the IAM method results in overcompensation of the plaintiff class in contravention of *Wickham*'s guidelines. 955 F.2d at 834. In support defendant correctly points out that "[n]o one who invested in a T-bill in October 1984, which is a 52–week note, would be earning today the same 11.36 percent rate of interest on that amount if it was reinvested in a T-bill in each 52–week renewal period thereafter." Defs.' Mem.Law, Doc. 257, at 17. GAF also accurately notes that the oldest components of damages, and therefore the units for which interest has accrued the longest, occurred during the early 1980s when the 52–week coupon equivalent rate was relatively higher than it has been during the past few years.

█ The selection of which rate to use and how to apply it is within the court's discretion. *See, e.g., Kinek v. Paramount Comms., Inc.,* 22 F.3d 503, 514 (2d Cir.1994). When applying the 52–week treasury bill coupon equivalent rate, three methods surface from the cases. The IAM method appears to have

---

3. All the monthly treasury bill interest rates from September 1984 through February 1995 are set forth in paragraph eleven of the joint stipulation filed prior to the damages hearing. Doc. 246. The clerk's office has provided the court with subsequent rates.

4. The applicable formula is $P \times (1 + i)^n = A$, where P is the principal, $i$ is the interest rate, $n$ is the number of years over which the interest

accrues and compounds, and A is the total amount of interest and principal at the end of the accrual period. We are solving for A. Thus, in the example in text, $12.25 \times (1 + .1136)^{12} = 44.55$.

5. The formula for simple interest is $P \times i \times n = I$, where P, $i$, and $n$ represent the same values as in footnote 4 and I equals the amount of interest generated.

been used in *Blanton v. Anzalone,* 760 F.2d 989, 993 (9th Cir.1985). The method advocated by GAF was applied in *Luciano v. Olsten Corp.,* 912 F.Supp. 663, 677 (E.D.N.Y. 1996) and *McIntosh v. Irving Trust Co.,* 873 F.Supp. 872, 882 (S.D.N.Y.1995). A third method, which GAF seems to offer as a second-best alternative, was chosen in *Hollie v. Korean Air Lines Co., Ltd.,* 834 F.Supp. 65, 71 (S.D.N.Y.1993) and *Golden State Transit Corp. v. Los Angeles,* 773 F.Supp. 204, 218 (C.D.Cal.1991). In these last cases, monthly treasury bill auction rates were averaged on an annual basis for damages that accrued over approximately ten-year periods, in contradistinction to the GAF method which would average them over the full term. The cases applying one of the three methods described above have implicitly acknowledged that no single one was preeminent. For instance, though Judge Koeltl used the GAF method in *McIntosh,* he cited the *Hollie* case with approval, which used averaged annual rates. 873 F.Supp. at 883.

 This court rejects averaging over the full term, the method GAF champions. It seems that defendant may be urging an averaging of rates over the period from first overcharge to final judgment in order to include in the calculation the relatively low auction rates since the entry of the preliminary injunction on January 3, 1995 (the IAM method does not take these rates into account). Of course GAF also wishes to minimize the effect of the inordinately high rates of the early 1980s applying to the oldest damage units which have accrued interest for the longest time. Although there is some validity to the latter concern, *e.g., Golden State,* 773 F.Supp. at 219, this court believes that the blended rate of 6.42 percent does not reflect adequately the fact that interest on even a relatively safe ten- or twelve-year investment would likely earn more than that. And the corollary to GAF's objection that a treasury bill bought in October 1984 pays more interest than one bought ten years later is that no one who bought a 52–week bill in September 1992 would be earning the same paltry rate of 3.13 percent on the same note bought two years later.[6] Nor do the two cases using the method that GAF advances persuade the court otherwise. In *Luciano* there was no opposition to averaging treasury bill rates over the full term that damages accrued, 912 F.Supp. at 677, while in *McIntosh* the opposing party urged the New York statutory rate, rather than an alternative means of applying the treasury bill auction rate, 873 F.Supp. at 882–83.

Moreover, the periods over which damages accrued in *Luciano* and *McIntosh* were shorter than the interval in the matter sub judice: five and seven years respectively rather than twelve. *See* 912 F.Supp. at 677; 873 F.Supp. at 883. In contrast, Senior Judge Hauk in *Golden State* rejected a constant rate for a ten-year period even though the postjudgment interest rate statute called for such a figure. *See* 773 F.Supp. at 219. "Clearly," that court observed, "in most situations where post-judgment interest is awarded, as well as most situations in which prejudgment interest is awarded, the applicable period is much shorter than ten years." *Id.* The implication is that *some* changes in interest return rates should be expected over longer periods of time, and GAF's full term averaging fails to reflect that reality. This perhaps explains why GAF's method has been used when shorter accrual periods are at issue. Over a shorter period, the rates may not deviate as sharply, thus minimizing the difference in result between the three methods. *Compare Luciano,* 912 F.Supp. at 677 (using GAF method during period 1991–95 when rates ranged from 3.13 to 7.34 percent) *with Hollie,* 834 F.Supp. at 71 (using annual averaging between 1983–93 when rates ranged from 3.13 to 12.17 percent). More to the point, with shorter periods the effect of compound interest is lessened,[7]

---

6. While it is true that the application of 6.42 percent to all damage increments will result in less interest for some months, it will mean more for others. For instance, for overcharges occurring in October 1992, classmember Peter Baburchak would earn $2.36 in interest under the IAM method but $5.09 with GAF's method (as-suming compound rather than simple interest and an even four years of interest accrual).

7. A simple math exercise reveals the truth of it. As we know, the GAF/*Luciano* method (with compounding) results in $13.73 in interest over twelve years upon classmember Ralph Allen's

which renders the question of which rate to apply to the oldest damage increments less significant. Over longer terms however compound interest becomes an important contributor to the total return; the effect is even more profound when the oldest damages arguably could be compounded at high rates, as in this case.

Although it finds the GAF method unsuitable, this court also has reservations applying the IAM method recommended by the magistrate judge. As Judge Hauk observed, "the early 1980's marked a period of unusually high interest rates, a situation which has not existed since that time." *Golden State*, 773 F.Supp. at 219. The annual averaging method ameliorates aberrantly high rates while still reflecting periodic trends in interest rates. The magistrate judge penning the *Hollie* opinion determined that annual averaging of treasury bill rates would "yield annual rates that reflect the financial market's sensitivity to the widely fluctuating rate of inflation that existed" during the 1983–93 time period. 834 F.Supp. at 69.

Under the *Hollie/Golden State* method, the court first calculates the average treasury bill coupon rate from September 27, 1984 to August 29, 1985, which includes thirteen auctions: 9.06 percent. This rate should apply to all damages accruing in the first twelve months of the interest period, i.e. October 1984 to September 1985. As observed supra, in October 1984 IAM classmember Ralph Allen was charged $15.25 for medical coverage which should have cost him $3.00, for a difference of $12.25. Applying compound interest at 9.06 percent for twelve years results in interest upon that overcharge of $22.43,[8] for total damages of $34.68. The same 9.06 percent rate would apply to Mr. Allen's overcharges through to September 1985. The rate for overcharges occurring from October 1985 to September 1986 would be determined by averaging the 52–week coupon rates from the next thirteen auctions, *viz.* the September 26, 1985 to August 28, 1986 auctions. The following table lists the average rates during the annual damages periods:

| Damages Period | Auction Dates | Average Coupon Rate |
| --- | --- | --- |
| 10/84 to 9/85 | 9/27/84 to 8/29/85 | 9.06 |
| 10/85 to 9/86 | 9/26/85 to 8/28/86 | 7.08 |
| 10/86 to 9/87 | 9/25/86 to 9/1/87 | 6.33 |
| 10/87 to 9/88 | 9/30/87 to 8/25/88 | 7.31 |
| 10/88 to 9/89 | 9/22/88 to 8/24/89 | 8.73 |
| 10/89 to 9/90 | 9/21/89 to 8/23/90 | 8.05 |
| 10/90 to 9/91 | 9/20/90 to 8/22/91 | 6.59 |
| 10/91 to 9/92 | 9/19/91 to 8/20/92 | 4.42 |
| 10/92 to 9/93 | 9/17/92 to 8/19/93 | 3.45 |
| 10/93 to 9/94 | 9/16/93 to 8/18/94 | 4.37 |
| 10/94 to 1/3/95 | 9/15/94 to 8/17/95 | 6.31 |

Although the choice between the IAM method and the annual averaging method may in fact result in only slight differences in amounts, reviewing the issue de novo, this court finds that the latter choice is more desirable. The court is aware that this conclusion sends the plaintiffs back to their spreadsheets to recalculate prejudgment interest. But since interest needs to be extended to the date of final judgment anyways, and another GAF retiree, Daniel Orband, must be added, *see* Pls.' Letter–Brief, Doc. 264, at 8 n. 3, this task should present no undue burden. To facilitate entry of final judgment, the court directs plaintiffs to file within ten days of the date of this order another spreadsheet exhibit, similar to exhibit 41 but calculating interest

October 1984 overcharge and the *Hollie/Golden State* annual averaging yields $22.43 over the same period. Put another way, annual averaging results in interest 63 percent greater than full term averaging over twelve years. But what if the period were only five years, as in *Luciano*? The GAF method yields $4.48 and the *Hollie/Golden State* procedure yields $6.65. Annual averaging over five years results in interest 48 percent greater than full term averaging.

8. To review, the IAM method resulted in interest of $32.30 on Ralph Allen's October 1984 overcharge. The GAF method with compound interest yielded $13.73 in interest, while the simple interest version only resulted in $9.50 in interest.

as explained above and adding classmember Orband. Interest should be calculated to the day the spreadsheet is filed. The exhibit should be accompanied by an affidavit stating the actual damages and interest figures.

## C. Compound or Simple?

Defendants argue that simple interest, rather than compound interest, is appropriate. The court disagrees. Compound interest is a real-world fact. The statutory provision for postjudgment interest, upon which both parties have relied in selecting rates, prescribes compound interest. 28 U.S.C. § 1961(b). Moreover, both the *Luciano* and the *McIntosh* cases, upon which GAF relied for its argument that treasury bill rates should be averaged over the period from October 1, 1984 until the date final judgment is entered, used compound interest. 912 F.Supp. at 677; 873 F.Supp. at 884. Indeed, the Court of Appeals for the Second Circuit has held that a district court's refusal to compound prejudgment interest annually, in the context of a Title VII suit for backpay, is an abuse of discretion. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

 Furthermore, given that plaintiff classmembers have been without the use of their funds for as long as twelve years, only compound interest will compensate them adequately. *See Hollie*, 834 F.Supp. at 71. Compound interest is also appropriate if the court presumes that the proceeds from the premium overcharges were invested in the reserves of the medical plan at compound rates. *Cf. United States v. Mason Tenders Dist. Council of Greater N.Y.*, 909 F.Supp. 891, 895 (S.D.N.Y.1995) (compound interest appropriate where prevailing plaintiff would have invested overpayments at compound rates).

Accordingly, after visiting the issue de novo, this court concurs with the Report–Recommendation that interest should be compounded. Next, the court addresses the matter of clarifying the scope and meaning of the permanent injunction granted in this court's prior memorandum-decision and order.

## D. Reinstatement

During the damages hearing, an issue left ambiguous by this court's prior opinion and injunction arose. It transpires that between GAF's first premium increases in 1984 and the present time, some 84 members of the IAM plaintiff class cancelled their medical coverage. Plaintiffs contend that GAF must offer to reinstate coverage for those persons. Defendant disagrees.

The court approaches this issue with the presumption that the injunctive relief this court has granted is in favor of *all* members of the IAM plaintiff class. To facilitate such relief for classmembers who withdrew from GAF's coverage after their wrongful premium increases, it seems necessary to compel GAF to offer to reinstate coverage for those members according to the terms dictated in the injunction. This is particularly equitable if the court assumes that the reason these classmembers cancelled coverage in the first place was because of the premium increases. The IAM class has submitted affidavits from six of the 84 who dropped coverage, all reflecting that had GAF adhered to the collective bargaining agreement rates they would have continued with the employee benefits plan. *See* Docs. 266–71. Given that the premium overcharges continued for more than ten years, it seems unfair to require classmembers to continue overpaying during that term in order to secure their right to the medical coverage for which they bargained.

GAF disputes that the increase in premiums was the motivating factor behind the decision of these 84 classmembers. Defendant submits "that reinstatement as a general remedy is inappropriate because of the absence of evidence relating to the reasons for cancellation of coverage by each IAM classmember." Def.'s Brief, Doc. 273. The court believes however that in the absence of evidence of motivation other than the premium increases, the reasonable and equitable approach is to indulge the presumption that classmembers discontinued coverage because GAF increased the premiums prohibitively.

That was, after all, the motivation for this lawsuit.

GAF alleges that seven of the 84 class-members have expressed motivations for cancellation. One of those seven, Peter Fol-tyn, explicitly communicated that he could not afford the coverage. Ex. 15 att'd to Def.'s Aff., Doc. 274. If the court accepts the proposition that only those classmembers who cancelled because of the premium increases should be offered reinstatement, then obviously Mr. Foltyn should be among those so offered.

The communications of two other class-members referred to by GAF cannot fairly be characterized as revealing any motivation for cancellation. The evidence relating to John Sedlak does not relate to why he might have cancelled his coverage. Rather, the letter from Mr. Sedlak complains about a one cent check he received from GAF's plan towards the medical costs of removing a cancerous tumor from his hand. Ex. 30. Indeed, Mr. Sedlak states that he is continuing the coverage because it paid for some of his wife's prescriptions. It was not until approximately nine months later that John Sedlak cancelled his coverage, for reasons we cannot speculate to. GAF should offer him reinstatement. Nor does the court perceive that the correspondence of Donald Exley, Ex. 14, contains any reason for his cancellation. He merely informs GAF that he has obtained alternative insurance, without explaining the reason why. GAF must offer to reinstate Mr. Exley.

The information GAF proffers with regard to the other four is ambiguous. Two of them however make express reference to the amount the enrollees pay for coverage. For instance, after requesting that GAF "cancel the $18.00 insurance deduction from my pension check," Jan Fudala explains that he is "no longer interested in *making payment* towards coverage that has a limited cap." Ex. 17 (italics added). If GAF had complied with the collective bargaining agreement premium schedule though plaintiff Fudala would not be making any payment towards his retiree coverage. This letter is scant evidence that Jan Fudala would be unwilling to receive for free the same coverage for which he

is unwilling to pay. Similarly, Robert Huber explains "that there would be no purpose *to pay $9 per month* when NO BILLS ARE PAID BY GAF." Ex. 18 (italics added, capitalization in original). Assuming the capitalized portion is an exaggeration, there may well be a purpose to receive the GAF coverage at no cost, even if it is not desirable at nine dollars a month. These two letters indicate that Fudala and Huber undertook an informal cost/benefits analysis and concluded that the coverage was not worth the premium. Since no premiums should have been charged at all after these classmembers reached age 65, it is appropriate for GAF to offer these two individuals reinstatement as well.

John Borowski and George Shaffer present the most difficult individual cases. Exs. 5 & 31. Both of them complain about the limited nature of GAF's coverage; but unlike Huber and Fudala, they do not implicitly balance the necessity of paying premiums against those limited benefits. Shaffer's letter does recite the bare fact he is paying nine dollars a month. He then states that GAF's "benefits are absolutely worthless to me." The court perceives this as angry hyperbole. It is unlikely that the benefits are completely without value. It is more likely that (at least in George Shaffer's estimation) they have no value at a cost of nine dollars monthly. This fails to answer the question of what Mr. Shaffer's evaluation of the benefits would be if they cost nothing. Mr. Borowski relates that his medical plan "does not help me pay any hospital or doctor's bills this year or in the future." Again the court cannot accept this statement as literally true. More probably, Mr. Borowski expects that the few times GAF will contribute to medical expenses will not be worth a monthly premium. But the coverage may be worth no premium. Therefore, the court rules that GAF should also offer Borowski and Shaffer reinstatement.

If it is true that cost was not a factor in the decisions of some of the 84 persons who cancelled their coverage, GAF will suffer no harm. The court is only requiring GAF to *offer* reinstatement. As plaintiffs sensibly point out, "[f]or those who were motivated by reasons other than cost in withdrawing, pre-

sumably that would be an offer which would not be accepted." Pls.' Letter–Brief, Doc. 264, at 7. GAF no doubt would criticize this answer as disingenuous: who would turn down an offer of free coverage, however minimal? But that is also the reason this court believes cost was likely an important factor in these 84 classmembers' decisions to cancel: who would cancel free coverage?

Finally, the court addresses four special cases mentioned in footnotes in GAF's brief. Olga Gooley, the wife of Albert Gooley, is alleged to be ineligible for coverage under the retiree medical plan because she is covered by the GAF plan for salaried retirees. Def.'s Brief, Doc. 273, at 9 n. 5. The same is true for the spouses of Donald Howe and Charles Huff. *Id.* at 10 nn. 6 & 7. Pearl Zlamal, the late wife of Albert Zlamal, is said to be no longer eligible by dint of her death in April of 1995. *Id.* at 12 n. 8. A reading of the terms of GAF's Comprehensive Medical Plan for retirees confirms these persons are not eligible. There does not appear to be any objection from the IAM class with respect to these spouses of retirees. Therefore, the court will not require that GAF offer reinstatement to these persons.

*E. Attorneys' Fees*

Pursuant to Civil Procedure Rule 54(d)(2)(B), both parties have moved to extend the time for filing attorneys' fees applications to thirty days after the entry of an order disposing of any appeal that may be taken to the Court of Appeals for the Second Circuit in this matter. The court has granted those motions. Doc. 276.

*II. CONCLUSION*

In sum the court adopts the Report–Recommendation of the Honorable David R. Homer, United States Magistrate Judge, in every respect except one: prejudgment interest should be calculated using annual averaging of the 52–week treasury bill coupon equivalent rates as detailed in Part I.B supra. To this end, the court ORDERS plaintiffs to file a spreadsheet exhibit similar to the one they submitted at the damages hearing with prejudgment interest calculated as explained herein, along with an affida-

vit vouching for its accuracy and stating the total damages and prejudgment interest figures for the entire IAM class. Interest should be calculated to the date the spreadsheet is filed. The filing should be accomplished no later than ten days from this order's signing. After it receives this filing, the court shall enter a short order granting final judgment.

 Additionally, the court ORDERS that GAF offer reinstatement to the IAM classmembers who discontinued their medical coverage following GAF's increase in premiums at rates in accord with the current injunction.

The time for filing applications for attorneys' fees in this action is extended to thirty days following the disposition of any appeal of this case to the Second Circuit. In the event no appeal is taken, such application may be made within thirty days of the entry of final judgment.

It is So Ordered.